No. 29,483.

J. W. GRANTHAM and E. J. PRATT, *Appellees*, v. THE HANENKRATT LEAD & ZINC COMPANY, *Appellant*.

(292 Pac. 757.)

Opinion filed November 8, 1930.

*C. E. Rumery,* of Columbus, *E. B. Morgan,* of Galena, and *Silas Porter,* of Topeka, for the appellant.

*F. W. Boss, Al F. Williams* and *Don H. Elleman,* all of Columbus, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an injunction action brought by J. W. Grantham and E. J. Pratt against the Hanenkratt Lead & Zinc Company to prevent the defendant from milling ore obtained under a mining lease of a certain forty-acre tract in a mining mill situated upon another adjoining tract of twenty acres, also held by defendant under another mining lease. The injunction sought was granted, and defendent has appealed.

One H. T. Morrison owned a tract of land of 140 acres in Cherokee county and on November 11, 1916, he leased it to plaintiffs for mining purposes for a period expiring November 11, 1936. Plaintiffs

subleased the tract in smaller parcels duly described to different parties. On November 24, 1925, they subleased a parcel of twenty acres to F. A. Tonnies and his associates, and on November 12, 1926, Tonnies and his party duly assigned the sublease to H. H. Hanenkratt, who in turn assigned the same to the Hanenkratt Lead & Zinc Company. This twenty-acre lease is designated as the H. H. H. tract and is still owned by the defendant.

On January 20, 1926, plaintiffs leased another tract to T. H. Bailey and his associates, containing forty acres, which adjoined the twenty-acre tract, and thereafter, on December 10, 1927, the lease on this tract was duly assigned to the defendant and is commonly known and referred to as the Conoco lease. In the H. H. H. lease was a provision that:

"All ore mined on this land shall be milled on this land and ore from other land shall not be milled or mined on this land."

In the lease on the Conoco tract was a provision that:

"All ores mined on said land shall be milled on said land and ore from other lands shall not be mined or milled on this land."

From the evidence the trial court made findings of facts and found that upon acquiring the H. H. H. lease on the twenty-acre tract, defendant began at once to explore and mine for ore and continued to do so until this action was brought. It built a mill thereon with a milling capacity from 200 to 300 tons per day, but there were few times when the mill was running at its capacity from the ore obtained on that lease. Before a shaft was sunk on the Conoco lease and the defendant was not getting ore sufficient to run the mill to capacity, there were ores not being mined on one corner of the H. H. H. lease as well as in a lower vein, but to obtain ore on this corner of the lease it would have been necessary to sink a shaft there. It was found that sometime prior to December 14, 1927, defendant and the then owner of the Conoco lease entered into negotiations for the sale and purchase of that lease. Pending the negotiations defendant and plaintiff Grantham, as well as the landowner, Morrison, met and had negotiations relative to the Conoco lease. A tentative arrangement was had then by which the landowner Morrison consented to reduce his royalty one and a half per cent and plaintiffs to reduce their royalty one per cent, in the event that the defendant obtained the Conoco lease. This conversation, it was found, did not result in any final agreement. Thereafter defendant took a sixty-day option on the Conoco lease with the right

to prospect the same. The defendant purchased a new drill rig and did prospect the lease and after prospecting exercised the option and made the purchase. Thereafter and prior to December 14, 1927, Grantham and Hanenkratt had several conversations relating to mining operations. They discussed the taking of the option on the Conoco lease, the reduction of royalties, the construction of a flotation plant, the milling of the ore from two tracts of land over the H. H. H. mill and the putting of each other in on any renewal or extension of the lease that might be obtained from the landowner, Morrison. In these conversations, however, there never was a meeting of the minds between plaintiff and defendant, nor was any completed contract between them made. Thereafter, and sometime prior to December 14, 1927, another conversation was had between plaintiff, Grantham, and Hanenkratt, when Grantham presented a proposed written agreement which Hanenkratt examined but refused to execute, and thereupon Grantham told Hanenkratt that he should go to plaintiff Pratt, and that whatever agreement Hanenkratt and Pratt should make would be approved by him. Hanenkratt did visit Pratt on December 14, 1927, and after some discussion entered into the following written agreement:

"December 14, 1927.

"*Hanenkratt Lead & Zinc Company, P. O. Box 494, Baxter Springs, Kan.:*

"GENTLEMEN—Confirming a verbal agreement reached on even date at the office of the Southwest Missouri Railroad Company in Webb City, Mo., in which Grantham and Pratt agree to make certain concessions to Hanenkratt Lead & Zinc Company in royalties during the present depression in the ore market, said concessions are as follows:

"All lead and zinc in bins or produced up to and including December 31, 1927, are to be sold and paid for as specified in lease.

"This agreement applies only to lead and zinc ores mined on and after January 1, 1928, and then only, when the base price or weekly selling price over the district on lead ore is below one hundred dollars ($100) per ton and the price of zinc is below fifty dollars ($50) per ton, Grantham and Pratt agreeing to accept a 4 per cent royalty on all ore sold below the above-named prices. Namely, when lead ore sells for one hundred dollars ($100) or more per ton, the royalty shall be 5 per cent on lead ore, and when zinc ore sells for fifty dollars ($50) or more per ton, the royalty shall be 5 per cent on zinc ore.

"It is further understood that the concessions in royalties as set out in this letter in no way affect the terms or validity of said lease or leases, and apply only to such ores as are mined on lease owned by the Hanenkratt Lead & Zinc Company and the one acquired from the Conoco Mining Company located in section No. 26, township 34, range 24 E., Cherokee county, Kansas.

"It is further understood that the said Hanenkratt Lead & Zinc Company

will continue to work and prospect both leases according to terms and conditions as specified in leases.  GRANTHAM & PRATT.

Accepted Dec. 15, 1927.  By E. J. PRATT.

HANENKRATT LEAD & ZINC COMPANY,

By H. H. HANENKRATT, *Pres.*"

The defendant then exercised its option on the Conoco lease, paying $7,500 for the same, cleaned up its ore already mined and purchased a Dorr thickener, for which they paid about $4,500.

It is found that there is a difference in the character of the ore found on the H. H. H. lease, and the ore mined on the Conoco lease. The ore found on the Conoco lease is what is known as sheet ground, and this character of ground requires a mill of greater capacity to mill the ore than the character of ground found on the H. H. H. lease.

Another finding is that if a mill were constructed on the forty-acre tract and the ore from said tract milled over such mill, mining operations could be carried on more rapidly and the land worked out in considerably less time than if ore from both tracts were milled over the H. H. H. mill alone. Also there is a reasonable probability that by the use of only the present mill the land covered by defendant's two subleases will not be mined out by the expiration of the original lease from the owner, which expires November 11, 1936, and that plaintiff would lose the royalty on the ore remaining unmined at that time.

About January 1, 1928, the defendant proceeded to extend the underground workings by driving the drifts which had been run under the H. H. H. tract up to and across the line into the Conoco tract, pulling the ore from the Conoco tract to the shaft on the H. H. H. tract, where it was intermingled with ores produced on the H. H. H. tract. This operation was continued from that time until in the summer of 1929, when the defendant closed down its mill for want of available ore in the drifts it was then mining, and this fact was known to plaintiff Grantham, or with reasonable diligence he could have known the fact. This manner of mining and milling of the ores in no way injured the defendant, but was in fact beneficial to defendant. In the summer of 1929 defendant commenced sinking a shaft on the forty-acre tract with the purpose of mining the ore through its H. H. H. mill. When the shaft was down about forty feet defendant's foreman told Grantham that the purpose of defendant was to mine the ore on the forty-acre tract and mill it over the H. H. H. mill. Grantham told the foreman that he would not

permit such milling. During this time the ores from both tracts were milled together and sold together and the proceeds paid into the deposit bank, without any distinction or separation, and royalties amounting to $22,318.23 were paid to the landowner and plaintiffs, as had been done prior to January 1, 1928, except the royalty at the reduced rates of six per cent to the landowner and four per cent to the plaintiffs. That about one-half of said ore came from the H. H. H. lease and one-half from the Conoco lease. The foregoing covers the essential facts found by the court.

The court concluded that defendant was bound by the terms of the contract providing that only the ore mined on a lease could be milled on that lease, and that the taking of ore from the forty-acre tract and milling it over on the H. H. H. mill was a violation of the terms of the subleases. It was held that the plaintiffs were entitled to the injunction prayed for, and judgment enjoining the defendant was given.

The defendant assigns a number of rulings as errors, but most of its argument is directed to the contention that the findings and decisions of the trial court are contrary to the evidence and the law and that findings requested by defendant should have been made. Most of the contentions center on the restrictive agreements in the subleases that the ore mined on one lease should be milled thereon, and that no ore from other lands should be mined on such lease. It is admitted that defendant was preparing to remove the ore from the forty-acre tract and mill it over the mill on the twenty-acre tract, and was claiming the right to so remove it. It is contended that it had been removing it for twenty-two months under a verbal agreement between the plaintiffs and defendant, and that the lease on the Conoco tract had been purchased for the purpose of obtaining the ore to keep the mill in operation. This had been done, it is contended, with the knowledge and consent of the plaintiffs; that large sums of money had been invested in the sublease on the Conoco tract and the development of the lease pursuant to the verbal agreement, and that the restrictive covenants had been abandoned by all parties on the theory that the two tracts of land had been thrown together as one mining operation. It is insisted that following the verbal consent the defendant mined the two tracts together for a considerable time, and that this was acquiesced in by the plaintiffs and in this way they had waived the right to insist upon the restriction written into the lease. On the part of the plaintiff it is

urged that what is called by the defendant an agreement, and frequently spoken of as an agreement, was only a tentative negotiation which did not culminate in an agreement. Plaintiff testified that no agreement was ever made and no permission was ever given to mill the ore from the forty-acre tract over the H. H. H. mill, and it is contended that it is made a question of fact whether an agreement was consummated and that on the testimony the court was warranted in the finding made that no contract was ever completed, except as appears in the written contract of December 14, 1927.

It is insisted by defendant that the decision is contrary to the evidence and the law; that the evidence shows that defendant purchased the Conoco lease to obtain ore sufficient to operate the mill on the H. H. H. tract and that this was well known and orally agreed upon by plaintiffs, and that this amounted to a modification and abandonment of the restrictive covenants in the subleases that all ore mined on each lease must be milled thereon, and that no ore from other lands shall be milled on such lease.

Another contention is that in any event plaintiffs are estopped to enforce the restrictive covenants in the lease prohibiting the milling of ore on one lease obtained from another leased tract. This claim is based on the fact that plaintiffs knew that the purpose of defendant in leasing the Conoco tract was to obtain sufficient ore to keep the mill running on the H. H. H. lease; that this was verbally consented to by plaintiffs and that defendant proceeded at once to operate the two tracts as one mining operation and continued to do so for months, and that plaintiffs had acquiesced in such operation and had accepted the royalties paid to the deposit bank during such operation.

As to the restrictive covenants in the lease relating to the separate milling of ores obtained from the different leases, there is and can be no contention as to the validity of the covenants or as to their meaning. They are specific, their terms free from ambiguity and if they were not modified nor waived, must be regarded as enforceable. Were the covenants modified or abandoned? They were the subjects of conversations and discussions between the parties on more than one occasion. In one of these conversations with plaintiff, a tentative arrangement was arrived at to the effect that if defendant purchased the Conoco lease for which it was negotiating the royalties to be paid would be reduced to the figures already mentioned. The Conoco lease had not then been procured, and under the testi-

mony the court was justified in finding that a completed arrangement between plaintiffs and defendant had not been effected at that time. Afterwards, defendant did procure a sixty-day option on the Conoco lease and prospected it to some extent, and later purchased it. Sometime after the first conversation another one was had by Hanenkratt with plaintiff Grantham, in which they discussed at some length the reduction of royalties on the Conoco lease in case it was obtained by defendant, the construction of a flotation plant and the extension of the lease by Morrison, the landowner, prior to its expiration in 1936, and the milling of the ore obtained from both leases over the H. H. H. mill was also considered. Although the evidence is contradictory as to whether an agreement was made on any proposition at the time, there was evidence warranting the finding by the court that there was no meeting of the minds of the parties nor was a completed contract made on the propositions discussed. This finding is fortified to some extent by the fact that later when Grantham prepared a written contract covering the propositions involved in the discussion and presented it to Hanenkratt he refused to sign it. This fact tends to show that an understanding and assent as to the terms of the contract had not been reached. At this later time there was further discussion as to the terms and conditions of the proposed agreement, but without result, and as Grantham was about to go upon a journey that would keep him away from Kansas for a considerable time, it was suggested that defendant should continue negotiations with Pratt, the other plaintiff, and that any agreement made with Pratt would be approved by Grantham. Shortly afterwards Hanenkratt visited Pratt and continued negotiations with him and finally ·reached an agreement which was committed to writing and was signed by both parties. That appears to have been the consummation of their preliminary negotiations. But defendant contends that it only covers the things specifically mentioned and that no specific mention was made of the restrictive covenants in the leases. Defendant argues that the first conversation resulted in a verbal agreement that defendant might mill the ore taken from both tracts in the mill on the twenty-acre tract. At that time no lease had been obtained on the forty-acre tract and neither party could assume that a lease from a third party would be obtained; besides, it appears that the restrictive provision prohibiting the milling of the ore on both leases over the mill on one of them continued to be a subject of discussion

between them thereafter, indicating that the negotiations in the first conversation were tentative in character and that a completed contract had not been made. The subsequent negotiations covered not only the milling restriction, but, as we have seen, a reduction of royalties to be paid, the putting in of both plaintiff and defendant in any extension of the lease by the landowner, and the adding of a flotation appliance. Both parties were concerned in the renewal of the lease as all of the ore might not be mined out before the original lease would expire. The defendant, of course, was concerned about the restriction preventing the milling of ore upon mills in each individual place. The plaintiffs were concerned in that a mill should be placed and used on each lease so as to facilitate the extraction of the ore before the expiration of the lease. They were interested, too, in that the mill on the twenty-acre tract, because of its character and limited capacity, might not be expected to mill all the ore on both tracts prior to the expiration of the lease. It appears that the royalties and renewal of the lease were the principal subjects of discussion and division in the preliminary negotiations.

A reasonable inference from the evidence is that no final agreement on any of the propositions was consummated prior to December 14, 1927, when the negotiations ended in the execution of the written contract. The general rule of law is that the execution of a written agreement following preliminary negotiations embraces the negotiations of the parties and constitutes the real contract which measures their rights. It has been said that the rule is that when parties have entered into written engagements with express stipulations, it is manifestly not desirable to extend them by implication. The presumption is that having expressed some they have expressed all the conditions by which they intend to be bound under the instrument. (*Burnes v. McCubbin*, 3 Kan. 221; *Railroad Co. v. Gorman*, 79 Kan. 643, 100 Pac. 647; 22 C. J. 1098.)

In the absence of fraud, deceit, duress or the like, a party is bound by a contract to which he has assented by attaching his signature, and he will not be permitted to say that he did not agree to its terms. As will be observed, the ultimate written contract, instead of modifying the restrictive covenants embodied in the leases, provided that:

"It is further understood that the said Hanenkratt Lead & Zinc Co. will continue to work and prospect both leases according to terms and conditions as specified in leases."

The terms and conditions so referred to were definitely stated and included the mining restrictions written into the leases. Although the language of the restrictions was not quoted at length in the written contract, the reference made to them clearly shows that the terms and conditions of the leases were to be carried out except as to the provisions reducing the royalties. In view of this clause of the contract it cannot be said that the restrictive conditions of the lease were outside the consideration of the parties or of the provisions of the contract. If defendant intended that these conditions should be eliminated or modified, Hanenkratt should have had it done when the contract was made, but instead of doing so he in effect confirmed the restrictions by stipulating that the terms and conditions should be carried out as specified in the leases.

Under the evidence and findings it cannot be held that the restrictions were modified by any verbal agreement made prior to the execution of the contract of December 14, 1927.

The second contention of defendant is that, regardless of the validity and existence of the covenants of the lease, plaintiffs are estopped to enforce them. This claim is based on the theory that plaintiffs knew or should have known that defendant was taking ore from the forty-acre tract and milling it over the mill on the other tract. It appears that such milling continued for a considerable time and that royalties were paid and accepted by plaintiff on the ore so mined. It appears that underground drifts extended from the twenty-acre tract over into the forty-acre tract, and ore taken from the latter was milled through the mill on the twenty-acre tract before defendants even procured an option on the forty-acre tract. These drifts were extended later into the forty-acre tract and more ore was brought from that tract and put through the mill on the twenty-acre tract. Later a shaft was started by the defendant on the Conoco tract, and when it was down about forty feet, Grantham, learning of the purpose of the defendant, told the foreman in charge in June, 1929, that plaintiffs would not allow the defendant to mill the ore obtained on the Conoco tract over the mill on the other tract; that the lease contract provided that there should be a mill on each lease, and this statement of Grantham was communicated to the defendant on the same or the next day. It appears that underground drifts had been extended from the twenty-acre tract over on the Conoco lease and considerable ore was taken and milled over the mill on the other tract without sepa-

ration, and that plaintiffs had been paid royalties on the output from both leases. The milling was continued from the early part of 1928 until about the middle of the summer of 1929. When a. shaft on the forty-acre tract was started in 1929, Grantham had protested, as has been stated, the drilling was continued down to the 235-foot level at an alleged cost of $25,000, upon the ground that Grantham had visited the mines a number of times and knew, or should have known, that ore from the Conoco lease was being treated at the mill on the other tract. Grantham says that he was not aware that defendant was carrying any quantity of ore from the forty-acre tract to the mill and some misunderstanding existed as to the location of the line between the two tracts and as to whether a certain fence was on the dividing line. Further, it appears that Grantham was in California during the winter of 1927 and 1928, and was away on a world tour from January, 1929, until June of that year, and hence had little opportunity to know of the processes of the defendant. But assuming that he should have known of the carrying of the ore over to the mill on the other tract, does that knowledge estop plaintiffs from enforcing the terms of the lease when the injunction was sought? It is essential to an estoppel that the party asserting it relied on representations or conduct of the other party to his prejudice and also without knowledge of the real facts. It has been said with reference to estoppel *in pais* that:

"In order to constitute this kind of estoppel there must exist a false representation or concealment of material facts; it must have been made with knowledge, actual or constructive, of the facts; the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; it must have been made with the intention that it should be acted upon; and the party to whom it was made must have relied on or acted upon it to his prejudice. To constitute an 'estoppel *in pais*' there must concur an admission, statement, or act inconsistent with the claim afterward asserted, action by the other party thereon and injury to such other party. There can be no estoppel if either of these elements is wanting. They are each of equal importance." (21 C. J. 1119.)

As to whether defendant should have relied on the conduct or acquiescence of plaintiffs; it may be noted that defendant had dickered with plaintiffs in an effort to secure a modification of the restrictive covenants and had been unable to secure such an agreement. In face of a refusal of plaintiffs to come to such an agreement, why should defendant be misled by the so-called acquiescence, and more than that, an essential element of the estoppel claimed appears

to be lacking; that is, that defendant was prejudiced by the acquiescence or conduct of the plaintiff. It has been stated that:

"In order to create an estoppel *in pais* the party pleading it must have been misled to his injury; that is, he must have suffered a loss of a substantial character or have been induced to alter his position for the worse in some material respect. As otherwise expressed, where no available right is parted with and no injury suffered there can be no estoppel *in pais*. And *a fortiori*, an act clearly beneficial to the person setting up the estoppel cannot be relied on. In the absence of injury, it is, of course, immaterial that the other elements of estoppel are present." (21 C. J. 1135.)

In speaking of the matter of prejudice or injury as to the mining of the ore, Hanenkratt said:

"There was no expense to go to in order to bring it, the ore, from the forty over to the mill. That did not injure me. We found ore there. We had no extra expenditure for that. It was a benefit to us, to my company, to mill the forty through the drifts to the east twenty. We didn't have to go to any extra expense whatever to do that."

Upon the testimony respecting the prejudice or injury, the court made the finding:

"That this manner of mining and milling of the ores in no way injured defendant company, but was in fact beneficial to the interests of said defendant."

We are led to agree with the decision of the trial court that the plaintiffs were not estopped from enforcing the covenants of the leases.

Some question is raised as to the right of plaintiffs to invoke the remedy of injunction, but that is deemed to be an available remedy. (*Godfrey v. Black*, 39 Kan. 193, 17 Pac. 849; *Southern Fire Brick Co. v. Sand Co.*, 223 Ill. 616.)

We find nothing substantial in the objections to rulings of the court on the admission of evidence, nor any valid ground for reversal.

The judgment is affirmed.