No. 33,214

THE PEOPLES ICE & FUEL COMPANY, *Appellee*, v. THE DICKEY OIL COMPANY, *Appellant*.

(65 P. 2d 319)

Opinion
filed March 6, 1937.

K. W. *Pringle* and *Claude I. Depew,* both of Wichita, for the appellant.

C. W. *Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger* and *E. S. Hampton,* all of Salina, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action by the plaintiff to enjoin defendant from violating the provisions of a claimed contract under which plaintiff was purchasing all the natural gas from a lease owned by defendant, and from a judgment for plaintiff the defendant appeals.

Appellant contends the evidence was insufficient to prove the contract and that the claimed contract, if otherwise proved, was so indefinite, uncertain and inequitable it was unenforceable. In connection, the question of admissibility of evidence as to customs prevailing, and the sufficiency of such evidence, is presented. A final contention is that irreparable injury and lack of adequate remedy at law were not shown.

In order that intelligent consideration may be given appellant's contention, it is necessary that we briefly review the pleadings.

Plaintiff alleged it was engaged in the purchase of natural gas and maintaining a market for all gas wells in the gas field in McPherson county, and was collecting, distributing and selling it to another company which supplied 110 cities in Kansas, its requirements being from thirty-five to one hundred and six million cubic feet per day; that in its operations it has purchased the entire output of said wells and takes its needs from said wells proportionately; that it is impossible to purchase gas on the open market. That the history of gas wells in McPherson county is that production is not

permanent, the life of a well is limited and can be prolonged and the gas conserved by taking only a portion of the open flow each day, and that it had been the intent and purpose of plaintiff to conserve the gas so that customers would be assured of an adequate supply as long as possible.

"And it has been the custom and practice of the plaintiff and all producers of gas with which it has contracts of purchase to take as much gas from each producer as is possible each day, and to treat each producer on the same basis; that is, to prorate the requirements of the plaintiff with the producers and take from each producer a proportion of said gas on the basis of the production of each producing well."

It was further alleged that plaintiff had purchased gas in the field for six years from about 150 wells; that 50 wells had ceased to produce, and in order to have an adequate supply it was constantly acquiring additional production; that defendant is a gas producer and has sold plaintiff gas; that in its various purchases it had established and used a uniform contract with which defendant was familiar; that defendant owned a certain leasehold, and prior to January 4, 1935, had commenced to drill a well hereafter designated as Tull No. 1; that the well was completed on January 4, 1935, and produced both oil and gas, and on that day plaintiff and defendant by their respective officers and agents entered into an oral contract whereby plaintiff purchased and defendant sold the entire supply of merchantable gas produced from the lease at the rate of six cents per thousand cubic feet, all according to the terms of the uniform contract, the agreement being the plaintiff was to receive the gas in accordance with the approved practice, etc. That plaintiff immediately constructed a pipe line to transport the gas from defendant's well to plaintiff's transportation lines; that on January 6, 1935, defendant notified plaintiff the well was ready and it would like to have it connected so as not to waste the gas. Gas was turned into plaintiff's lines on January 12, 1935, and thereafter plaintiff took from the well its proportionate requirements in proportion to the size of the well. It was further alleged the defendant ratified the contract by letter on February 7, 1935. Briefly stated, this letter accompanied abstracts of title covering the lease and stated if plaintiff had any requirements to advise defendant, who would give them immediate attention. Allegations as to capacity of the well will not be set out. It was then alleged that defendant had entered, or was threatening to enter, into a contract with third parties for the sale

of the gas produced from the lease, and would, unless restrained, break its contract with plaintiff, and would not be able to perform the contract with plaintiff; that plaintiff had no adequate remedy at law and unless defendant was restrained plaintiff would suffer irreparable loss which cannot be compensated in damages. The prayer was for injunction restraining defendant from violating the contract, and for equitable relief.

Defendant's answer alleged the completion of its combination oil and gas Tull No. 1 well and its then capacity; that under the then existing rules and regulations, in order to produce its allowable amount of oil, it had to produce and find a market for approximately fourteen million cubic feet of gas per day; that the gas had a considerable gasoline content which defendant deemed advisable should be extracted. It then alleged its version of the dealings with plaintiff, that plaintiff would not agree to take any specified amount of gas per day, and that defendant had informed plaintiff it would sell gas to others than plaintiff in order that it might produce its allowable amount of oil; that it intended to take the gas from its wells to its extracting plant, and to use gas and to sell gas for drilling operations; that under such circumstances plaintiff took gas. It was further alleged that the agreement referred only to Tull No. 1 well and there was no mention as to other wells that might be drilled on the leasehold. It was further alleged that defendant had had dealings with plaintiff and allied companies, but in them the purchaser took all gas up to where the allowable of oil could be produced without wastage of natural gas, but in the case of Tull No. 1 well, plaintiff and its agents refused to agree to take such amount, or any amount, of gas; that subsequent to January 10, 1935, defendant had been selling gas from the lease to the Dickey Refinery and other users known to plaintiff, during all the time plaintiff had been taking gas; that plaintiff had a pipe-line connection with gas reserves in Texas and had an adequate supply without taking any gas from the Tull lease so that it would not suffer irreparable injury if it should take no gas from the Tull lease.

At the trial, the testimony showed that in the various negotiations plaintiff was represented principally by its vice-president, Brock, and by one Smith, and that defendant was represented principally by its president, Dickey, and one Ballard, vice-president of the Dickey Refinery Company. As abstracted, there are 88 pages of testimony dealing largely with the oral negotiations tending to show

that a contract as contended for was or was not made, as well as tending to show uses and customs obtaining in the McPherson county oil and gas fields with reference to the sale of gas. Space forbids a detailed statement or even much of a summary of the testimony, but so far as is necessary it will be mentioned later. As a result of the trial, findings of fact and conclusions of law were made by the trial court. Because of a motion of defendant to modify them, certain portions of the findings are in italics.

"FINDINGS OF FACT

"1. The plaintiff is a Kansas corporation organized for the purpose, among other things, of purchasing and gathering gas from gas-producing wells in McPherson county gas fields and transporting it to its customers. C. E. Brock is the vice-president of this company and as its general manager has charge of the purchase of such gas.

"2. The defendant is a Kansas corporation organized for the purpose, among other things, of producing and marketing gas and oil and also operates in McPherson county. George P. Dickey is its president and executive officer.

"3. The plaintiff was first incorporated as the Kansas Gas and Gasoline Company; later, by an amendment to its charter its name was changed to its present one. It was organized when gas was first discovered in McPherson county and since then it has furnished the only market for gas produced in the fields. It provides and maintains a market for all gas wells producing gas in commercial quantities in McPherson fields.

"4. The plaintiff, under contract, furnishes gas to the Kansas Power and Light Company, which owns and operates gas distribution systems in 110 cities in Kansas and sells gas for wholesale distribution in 12 other Kansas cities. The plaintiff has furnished all but two percent of the gas marketed by this power and light company.

"5. The amount of gas required to be furnished by plaintiff to the Kansas Power and Light Company varies from 27 million cubic feet per day in the summer to 106 million cubic feet in the winter.

"6. Gas from wells which produce gas only is called dry gas. Wells producing both oil and gas are called 'combination wells' and the gas from such wells is 'wet gas.' The average life of a well producing gas in this field is approximately five years, and the life of a combination well is much shorter. During the first year a well producing dry gas declines 50 percent of its original open flow, and its decline is more gradual thereafter. Gas flow in combination wells declines much faster than in wells producing dry gas.

"7. The life of a well producing gas can be sustained a longer period and the natural gas conserved by taking only a portion of the open flow each day and the state has prohibited the waste of natural gas and has limited flow in the McPherson field to 25 percent of the open flow.

"8. The plaintiff, in order to supply its customers, provide for increase in market demands, and offset the decline in production of the wells to which its gathering lines are connected, must constantly purchase additional gas

from wells producing gas in gas fields. Natural gas has never been successfully stored in artificial containers.

"9. As soon as a producer contracts to sell gas to plaintiff, it connects the well with its gathering lines and commences to take gas from the well, contracting to take all gas from all wells producing in commercial quantities on the lease, though not at any specified rate of taking, and in order to conserve the supply, furnish and maintain a market, and to avoid discrimination, the custom has been established by the plaintiff and all producers in the county that the plaintiff buy all the merchantable gas produced from the lease, excepting casing-head gas and sufficient gas for the fuel requirements of the producer on the lease, paying therefor six cents per thousand cubic feet; taking such gas as long as it can be delivered in commercial quantities and at sufficient pressure to enter its lines, its gas requirements being prorated among all producers, except that it gives to combination wells an advantage by taking a sufficient amount of gas each day to keep the well alive, regardless of proportion, and if possible to take enough to allow such a well to make its 'allowable' of oil, when necessary taking less gas from dry wells in order to permit this.

"10. It is the custom of the producers and the plaintiff in purchasing gas to treat each lease as a unit, not each individual well, and the plaintiff uses a uniform contract which it uses in the purchase of all gas from producers in the McPherson county fields, the contract being in evidence as Exhibit 4.

"11. It is the custom in the McPherson county field for the contract of sale and purchase first to be made orally, usually by telephone and subsequently confirmed by the execution of the formal written contract. (Exhibit 4.)

"12. George P. Dickey, the president and executive of the defendant company, who made most of the negotiations for the sale of gas involved in this action, has been producing oil and gas in McPherson county for more than five years before any of the transactions in this controversy arose. He had sold gas from combination wells, which he had drilled in the McPherson field, on two occasions prior to this one. While these contracts, exhibits 1 and 2, were between Dickey and the McPherson Oil and Gas Development Company, and covered two leases developed by Mr. Dickey known as the Williams and Decker leases, which had been secured by Dickey from the Shell Petroleum Corporation, who had contracted the gas rights to the plaintiff company prior to assigning the leases to Dickey, yet Dickey did sign the gas purchase contract and knew its terms *and that it was the standard form used by the plaintiff in purchasing gas.*

"13. The defendant company owned an oil and gas lease known as the Tull lease, being the east half (E½) of the southwest quarter (SW¼) of section thirteen (13), township nineteen (19) south, range three (3) west of the sixth principal meridian. It commenced drilling a well thereon in September, 1934. On or about January 5, 1935, the well was completed as a combination well. The potential, taken on January 6, was 600 barrels of oil and 28 million cubic feet of gas. The state proration officer fixed the amount of oil allowed to be produced at 250 barrels per day, later reducing this to 30 percent of the potential, taken in March, 1935, of 115 barrels. Both potential and allowable have remained the same to the date of trial.

"14. January 2, 1935, Brock telephoned Dickey, inquiring as to the amount of gas in the Tull well, and was told that Dickey did not know, and it was arranged to have Dickey and Ballard of the defendant company and Smith of the plaintiff company meet at the well. They there learned that the well gauged 28 million cubic feet of gas, but did not learn, due to clogging of the equipment, what the potential was. At this time Dickey told Smith, plaintiff's McPherson agent, that as long as the plaintiff company would take enough gas so that Dickey could produce his oil allowable, the plaintiff would not have to worry about getting gas from the well. Dickey mentioned a situation he had encountered in his sale of gas from the Williams and Decker leases where he had sold gas for six cents per thousand cubic feet and bought gas back at eighteen cents, and he stated that he would not sign another contract like that. He also told Smith that his refining company was going to put in a gasoline absorption plant to take the gasoline out of the gas from the lease, and he was going to run gas from the lease to the refinery for that purpose and also for fuel for the refinery. He also mentioned that he had sold some gas to another operator for drilling purposes on an adjoining lease. *He further stated that as soon as the potential from the Tull No. 1 was taken he would sell him the gas and not to worry.*

"15. About January 6, 1935, the state proration officer notified Dickey not to pop-off any gas after his test was completed. The test was completed January 6 and on that day Dickey called Brock and told him to connect up the well. He said he, Dickey, was going to Tulsa and wanted to be sure the well was taken care of before he left.

"16. January 7, 1935, Brock telephoned Dickey that due to a low-pressure separator on the well, gas would not flow into the collecting lines. Dickey promised to have a high-pressure separator installed at once, which was done.

"17. January 10, 1935, Brock mailed defendant company the standard form of gas-purchase contract, exhibit 4, drawn to include all the gas from the Tull lease, which Dickey did not and never has signed.

"18. January 11, 1935, Ballard, of the defendant company, and Brock and Smith, of the plaintiff company, met in McPherson. Ballard wanted Brock to agree to take at least five million cubic feet of gas per day, but Brock refused to agree to take any definite amount. In this conversation Ballard told Brock that as soon as the refining company's gasoline absorption plant was completed, the Dickey Company would send the gas through the absorption plant and deliver it to the plaintiff at the refinery after the gasoline had been extracted. This arrangement was agreed to by Brock, but pending the completion of the plant both agreed that gas would be delivered direct from the well into the plaintiff's high-pressure lines.

"19. After this conversation, defendant drilled another well on the Tull lease, which was brought in as a combination well with a potential of 137 barrels of oil and gauged 8 million cubic feet of gas, which well was connected to plaintiff's lines and the gas delivered to plaintiff. The potential has declined on this well, but to what extent is not in evidence.

"20. *Plaintiff has taken an average of 1½ million cubic feet of gas each day* since the connection was made on January 12, which is a sufficient amount of gas to keep the wells alive and has permitted the defendant to make its

allowable of oil each day. *This has amounted to more than the proportionate share to be taken from this lease. Plaintiff has paid and defendant accepted six cents per thousand cubic feet for all gas taken.*

"21. Defendant has furnished gas from this lease to the Globe Refining Company, and the Dickey Refining Company *has made a contract to furnish gas to certain trustees for the purpose of distributing gas in the city of Lindsborg.*

"22. There is no adequate remedy at law available to plaintiff to protect itself against loss and damage."

### "Conclusions of Law

"1. The telephone conservation of January 2, in which Dickey said he would sell Brock the gas, supplemented by that of January 6, in which Dickey told Brock to connect up the well, in the light of prior conversations and in connection with the fact that Dickey knew at that time the customs of plaintiff company in regard to purchasing gas, in fact objected to one, which was eliminated, constituted a verbal contract for the sale and purchase of all gas from the Tull lease, less that required for fuel at the Dickey refinery, and in accordance with the terms of the standard form of gas-purchase contract, exhibit 4.

"2. This contract was later modified on January 11, 1935, by the conversations between the representatives of the two companies, to permit delivery at the refinery upon completion of the gasoline absorption plant.

"3. Defendant should be required to perform its contract with plaintiff and enjoined from delivering gas to anyone but the plaintiff, except to the Dickey refinery for its fuel requirements."

On May 28, 1936, judgment was rendered in favor of plaintiff and against defendant in accordance with the findings of fact and conclusions of law. Thereafter, defendant filed its motion that the court strike findings 9, 10 and 11 based on customs of the plaintiff, that it strike the italicized portion of finding 12 as not supported by the evidence, that it substitute for the italicized part of finding 14 the following:

"Dickey told Smith that as soon as the potential from Tull number one was taken, he would take the matter up with Brock, and not to worry."

that it substitute for the first thirteen words of finding 20, as italicized, the following:

"That the gas taken by plaintiff and by all other users from the well, still has left the defendant unable to produce its allowable of oil therefrom";

and that it strike out the other italicized part as immaterial; that it strike the italicized words in finding 21 as not supported by the evidence, and to substitute therefor the finding in that respect previously requested by defendant, and that it strike finding 22 as immaterial, if the foregoing requests were allowed. Defendant also

filed its motion for a new trial, and for judgment on findings either as requested by it or, in the alternative, on the findings of the court, for the reason that the latter findings do not support judgment for plaintiff. Upon the hearing of said motions, the trial court amended finding No. 21 to read as follows:

"Defendant has furnished gas from this lease to the Globe Refining Company, and the Dickey Refining Company has made a contract to furnish gas to certain trustees for the purpose of distributing gas in the city of Lindsborg. Said Dickey Refining Company is securing said gas from the Dickey Oil Company, and said Dickey Oil Company is supplying said gas from said Tull lease."

and otherwise denied the motions. The appeal to this court followed.

In connection with appellant's contentions as outlined in the second paragraph hereof, it is argued that some of the findings of fact are not supported by competent evidence, and that others are contrary to the evidence, and that the competent testimony does not warrant and support the relief granted. No good purpose will be served by reviewing all of the testimony. An examination of the record before us discloses substantial basis for the findings of fact, if it be assumed that the evidence of custom and usage was competent. Appellant contends that the particular evidence of custom and usage offered and admitted and upon which findings 9, 10 and 11 are based was more inclusive than the allegations of the petition warrant. At the trial, objection was made to the testimony as to certain usages on that ground, and after some colloquy concerning allegations in the petition in which plaintiff asked leave to amend to conform to proof, the court overruled the objection. As we view the matter, the competency of the evidence is the real point at issue and not whether the proof went beyond the allegations of the petition. Appellant also contends the evidence, exclusive of that pertaining to custom and usage, did not prove a contract, and that a contract, otherwise not proved, cannot be proved by a showing of custom and usage, and that custom and usage cannot make a contract where the parties themselves have made none.

As part of its proof, plaintiff showed that prior to January 2, 1935, defendant was drilling a well on the Tull lease. At that time it was not known whether it would produce oil or gas or both or neither. Brock told Dickey he wanted to buy any gas on the lease and Dickey said he was "regular" and would sell to plaintiff. On January 2, 1935, having heard the well was completed and making gas

and oil, Brock called Dickey and reminded him he wanted to buy the gas. Dickey replied the well was not completed but Brock need not worry as he would get the gas when the well was completed. Dickey at that time told Brock other parties wanted gas but he would sell to Brock when the well was ready. On January 6 Dickey told Brock the well was completed, and he wished Brock would get the well connected. We need not now notice difficulties had as to installation of apparatus, etc. Brock prepared a form of contract of purchase and sale of gas, the form used being one of general use in the McPherson field, it being modified, however, to permit Dickey to use gas for his refinery requirements. Dickey expressed dissatisfaction because Brock would not agree to take a specific amount of gas per day. On January 11 Brock met Ballard, appellant's agent, and at their conference Ballard wanted Brock to agree to take five million cubic feet per day. Brock refused, stating it was impossible to agree to take any particular amount in one day. In this conversation, Ballard told Brock that Dickey wanted to lay a line from his well to his refinery and extract the gasoline from the gas and deliver the gas to Brock at the refinery instead of at the well. On January 13 the gas was turned into plaintiff's lines. Appellant insists that no agreement for the sale of gas was made, in that the price per thousand cubic feet was not agreed on, nor the amount to be taken, nor was anything said about the gas from other wells that might be drilled on the lease, and that if there was any agreement it bound Dickey to sell, but did not bind Brock to buy, and was therefore lacking in mutuality and cannot be enforced. At the trial and here, plaintiff contended that all of the negotiations between Brock and Dickey were carried on with full knowledge on the part of both as to the customs and usages of the field, as more specifically mentioned in findings 10, 11, and 12. As has been indicated, appellant's contention is that evidence as to these customs and usages is inadmissible; that without them a contract is not proved, and that where the parties have not made a contract for themselves, usage and custom cannot make one for them, citing in support *McSherry v. Blanchfield*, 68 Kan. 310, 75 Pac. 121, and urging the rule in *Atkinson v. Kirkpatrick*, 90 Kan. 515, 135 Pac. 579, is the one which should be invoked.

In the McSherry case it was held:

"In order that it may be binding, a custom or usage must be known to the party sought to be charged, or must be so notorious that knowledge of it will be presumed."

"Usage or custom cannot make a contract when parties themselves have made none."

"The proper office of usage or custom is to explain technical terms in contracts to which peculiar meanings attach; to make certain that which is indefinite, ambiguous or obscure; to supply necessary matters upon which the contract itself is silent; and generally to elucidate the intention of the parties when the meaning of the contract cannot be clearly ascertained from the language employed." (Syl. ¶¶ 1, 2, 3.)

It will be noted in that case there was no showing plaintiff was aware of the alleged custom relied on by defendant.

In the Atkinson case it was held that where a written lease made no provision for payment of water rentals by either landlord or tenant, evidence was not admissible to prove a custom that in the absence of agreement, the landlord paid the water bill, and,

"That the existence of the alleged usage or custom could impose no liability upon the landlord, nor could it create a contract where the parties have made none, and that proof of such usage is not admissible where the terms of the written lease are clear and unambiguous." (Syl. ¶ 5.)

In that case the lease in question was complete in its terms and clear and unambiguous.

In the early case of *Smythe v. Parsons*, 37 Kan. 79, 14 Pac. 444, the question of presumptions with reference to custom and usage was under consideration, and it was there held:

"Parties to a contract are presumed to contract with reference to a uniform and well-settled custom or usage pertaining to the matters concerning which they make the contract, where such custom or usage is not in opposition to well-settled principles of law nor unreasonable; and therefore, *held,* that the trial court did not err in permitting testimony to be introduced tending to prove a general custom at Wichita, with reference to the method of ascertaining the number of brick in a wall, the contract having been made at Wichita and not prescribing how the number of the brick in the wall should be ascertained." (Syl. ¶ 3.)

In *Strong v. Ringle*, 96 Kan. 573, 152 Pac. 631, where wheat was sold by telephone conversation, followed by written confirmation, and evidence was offered of a custom requiring objection to the terms if not correctly stated, it was held:

"When parties have undertaken to conclude a contract, the formation of which is governed by general usage, the implication is they intended to proceed according to the usage, if nothing be said to the contrary." (Syl. ¶ 1.)

Two quotations from the opinion may also be noted:

"It is true that the terms of an express contract cannot be contradicted by proof of an antagonistic custom. It is likewise true, however, that custom may

make a contract in the sense that it may define the rights and duties of the parties with respect to a matter upon which the contract is silent. The rule is well stated by the supreme court of the United States in the case of *Robinson v. United States,* 80 U.S. 363: 'Parties who contract on a subject-matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary.' (p. 366.)" (p. 575.)

"In the case of *McSherry v. Blanchfield,* supra, and in the case of *Atkinson v. Kirkpatrick,* 90 Kan. 515, 135 Pac. 579, the proper office of usage and custom was touched upon far enough for the purpose of those decisions, and a few pertinent authorities were cited. The subject was by no means exhausted. The general function of usage and custom is definition, explanation, elucidation. Whenever the matter is clear there is no function to be performed. Usually proof of custom is offered to elucidate the true intention of parties to contracts whose oral or written expressions, whatever they may have been, are known. The custom under consideration is informed by essentially the same spirit and fulfills essentially the same office. By entering into the relations of contracting parties at their very inception it clarifies them before complications arise and establishes intention beyond the need of definition, explanation or elucidation, and beyond dispute. It is, therefore, good business, good morals, and good law that when parties undertake to conclude a contract, the formation of which is governed by general usage, the implication is they intended to proceed according to the usage if nothing be said to the contrary." (p. 576.)

And in *Benton Grain Co. v. Reger,* 131 Kan. 735, 739, 293 Pac. 955, this court quoted with approval from *McSherry v. Blanchfield,* supra, and as above, and stated:

"The same rule was followed in another grain case, *Strong v. Ringle,* 96 Kan. 573, 152 Pac. 631, to the effect that such a custom was not to make a contract, but to elucidate one already made." (p. 739.)

A discussion of the above principles may also be found in 27 R. C. L. 187 and 17 C. J. 490, 501 *et seq.*

It is clear that evidence of custom and usage may not be received to vary or contradict the terms of a contract (17 C. J. 508), nor may it be received to make a contract where the parties had made none (17 C. J. 501). In this case, however, the petition alleged and the proof showed that certain customs and usages prevailed in the McPherson field. Starting with the proposition that plaintiff or its predecessors had furnished the only market for gas in the field, it was shown, among other things, that what may be called a standard form of contract was used; that the price for gas was the same in all instances; that when gas was purchased the leasehold was the unit and not the individual wells thereon; that negotiations were orally concluded and subsequently con-

firmed by written agreement. It was shown that Brock and Dickey were familiar with the usages and customs. When Brock first saw Dickey about this particular lease and expressed a wish to buy any gas the well then under construction would produce, Dickey said he was "regular" and would sell. Later when the well came in, it was connected with plaintiff's lines. Although there were some negotiations on January 11 about the amount of gas plaintiff would take per day, there was no dispute about price or other conditions, and on January 13 defendant connected its wells with plaintiff's gathering lines. After defendant's extraction plant was completed, the gas was delivered at the refinery as previously agreed. Later when another well was completed on the lease, it was connected to plaintiff's lines, and although not so stated in the court's findings, the evidence is that the connection was made by the defendant and not by the plaintiff. Under these circumstances, can it be said the contract, as made in the conferences between Brock and Dickey, and later between Brock and Dickey's agent, Ballard, was without regard to the customs and usage of the field, or should it be said that each party understood the situation so that express reference was not necessary.

It must be borne in mind that the answer to appellant's contention does not depend solely on abstract questions of law, about which there is little dispute; it depends on the application of the law to the facts. The evidence showed that both Brock and Dickey operated in the McPherson field from the time it was opened, and on behalf of their principals had had similar dealings in the past, and the very fact they did not discuss price and other wells to be drilled, but did discuss and provide for taking of gas first from the wells, and after the extraction plant was completed from the plant, was some evidence that each understood the situation fully and was contracting with it in view.

We are of opinion the court did not err in the admission of testimony with respect to custom and usage.

Appellant contends that in effect this was a suit for specific performance, and that a higher degree of proof is required than though it were merely a suit for damages for breach of contract. It may be conceded that the contention is predicated on a correct rule of law. (See 32 C. J. 190, 58 C. J. 933.) Upon that rule as a premise, appellant argues that even though a contract of some sort was proved, its terms were so indefinite, uncertain, ambiguous and in-

equitable that it is unenforceable in a court of equity. If we were to assume the facts to be what appellant claims, we would have little difficulty in agreeing. It resolves some controverted matters in its favor and assumes the incompetency of evidence as to custom and usage. We have held such evidence competent and properly admitted. We cannot review each separate contention of appellant, but as an instance it claims lack of certainty in the price to be paid for the gas, and the amount of gas to be taken, and with respect to the latter urges there is lack of mutuality which prevents enforcement. The evidence showed a standard form of contract used in purchasing gas in the field, and a standard price paid therefor, the negotiations leading up to the connection of appellant's well and extraction plant with appellee's lines, the connection by appellant of after-completed wells on the lease, and that appellee had taken the gas and paid the standard rate of six cents therefor and that appellant had delivered the gas and accepted the money therefor. It may be said that if there was uncertainty as to price, it has been eliminated by the conduct of the parties.

The contention there was lack of mutuality is predicated on a claim the evidence showed that appellee had refused to guarantee to take five million cubic feet of gas per day or some other definite amount. It is true there was such evidence, but as reflected in the court's findings, there was evidence that while appellee refused to take a specific amount in any one day, its proposition to appellant that it take all of the gas, except some reservations not in controversy, the amount to be taken each day to be proportioned according to its needs and the supply from the field, was accepted by appellant's installing the necessary apparatus and delivering gas into appellee's lines, not only from the original well, but from wells completed after the original connection was made.

On the question of mutuality, appellant directs our attention to *Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Co.*, 267 Fed. 35, as being in point. It is a well-reasoned case, and involves, in part, a situation similar to that before us. There the plaintiff company had made an agreement to purchase all the gas it needed from the defendant company, as long as its well produced and not to exceed twenty years. Later, plaintiff company entered into a supplemental contract with defendant company permitting it to buy from other sources. At a later period the defendant company notified plaintiff company its original supply was depleted, it was com-

pelled to extend its lines to other fields, and a different charge would have to be made, etc. Plaintiff company filed its bill in equity to compel defendant company to comply with its contract. Defendant company moved to dismiss the bill for want of equity, which motion was allowed. The circuit court, *inter alia,* considered the nature of the action and the question of mutuality raised, and held:

"An injunction against the breach of a contract is a negative decree of specific performance, and as a general rule the granting of the injunction is governed by the same principles, rules, and practice as apply to specific performance.

"As a general rule specific performance of a contract will not be decreed by a court of equity in favor of the party against whom that court cannot compel its performance.

"A contract for the delivery of personal property lacks mutuality, and cannot be specifically enforced, where the quantity delivered, if any, depends on the will or desire of one party, though it may be enforced if the quantity may be determined, as where it is for the delivery of all articles needed in a person's business.

"Where a contract to supply to a distributing company the natural gas it needed for distribution to the inhabitants of a city, which provided that the supply company furnish gas only to the distributing company, and the distributing company should take gas only from the supply company, was modified by a supplemental contract, which eliminated the exclusive clauses, but provided that all other provisions of the contract remain in effect, the supplemental contract also eliminated the agreement of the distributing company to take the gas it needed for the inhabitants from the supply company, contained in a provision not expressly modified.

"A breach of a contract whereby defendant agreed to supply natural gas at a stated rate to complainant for distribution to its customers will not be enjoined, where the contract had been modified, so that the distributing company was no longer required to get its gas from complainant [defendant], and the contract as modified was not mutual." (Syl. ¶¶ 1-5.)

It will be noticed that in the above case the plaintiff, by supplemental contract, had provided it could supply its needs from sources other than the defendant, and that it was not compelled to buy from the defendant.

In the case before us a different situation obtains. Here the defendant knew the plaintiff was obtaining gas from many sources in the McPherson field and selling the same to many towns and cities or the company supplying them, and that in so doing it had established and followed a practice of taking gas from various leases proportionate to its needs as measured by the demand on it; that with such practice or custom and usage in mind, defendant sold all

of its gas to plaintiff at the customary price, and thereafter connected its wells with plaintiff's lines, it being understood that while plaintiff was buying all the gas defendant's lease would produce, it would take the same from the wells according to the usual practice. We are aware there was contradicting evidence, but there was evidence warranting the court in finding to the effect above indicated.

In *Southwest Kan. Oil & G. Co. v. Argus P. L. C.*, 141 Kan. 287, 39 P. 2d 906, in a situation similar to that before us, plaintiff sought to compel the defendant pipe-line company to comply with its contract and supply it with natural gas. It was argued the contract was void for want of mutuality, based on a contention the market to be supplied was not fixed definitely in the contract. We shall not review the portion of the contract set out in the opinion nor the comment thereon. After consideration of the contract, and the evidence of proceedings under it, this court held the contract not void for lack of certainty or mutuality, and affirmed the judgment of the trial court ordering compliance and awarding damages. (See, also, *City of Holton v. Kansas Power & Light Co.*, 135 Kan. 59, 9 P. 2d 675.)

In the case before us, the findings of fact show a contract by which the plaintiff company has the right to purchase the gas from the Tull lease, with exceptions not here important, and to take the same in the manner above set forth, and no reason appears why if it did not do so, it could not have been compelled. The contract was not bad for lack of certainty nor for want of mutuality.

And finally, appellant argues there was no showing by plaintiff of irreparable injury or lack of adequate remedy at law. It is argued because plaintiff has other sources of supply, that the amount which defendant would sell to Lindsborg would not interfere, and that the only injury plaintiff would suffer if it did not furnish the Lindsborg supply would be its profit, which would be recoverable in money damages. This argument ignores the method of business of plaintiff and its expense in preparing to take care of it. It likewise ignores the fact there is no open market in which gas can be purchased. We do not know what the daily average of plaintiff's needs is calculated over a calendar year. The finding of the court, based on evidence, is that it varies from 27 million to 106 million cubic feet per day, and that plaintiff has taken an average of one and one-half million cubic feet per day from the Tull lease. It can

be seen the amount taken as against the need is substantial. Plaintiff's business demands that it so handle its supply of gas that it may profitably conduct its business. If each of the leaseholders from whom plaintiff buys may refuse to perform and urge that plaintiff's only remedy is in money damages, and that be true, then in the course of a short time plaintiff may find its supply gone, its pipe line useless, and itself remitted to a series of actions to recover damages for lost profits. The argument ignores plaintiff's obligations to furnish gas to the cities or companies with whom it has contracts and to whom it must respond if it fails.

In addition to the cases heretofore discussed, in which the question of the appropriateness of injunction as a proper remedy is discussed, see, also, *Wheat Growers Ass'n v. Schulte*, 113 Kan. 672, 683, 216 Pac. 311; *Grantham v. Hanenkratt Lead & Zinc Co.*, 131 Kan. 535, 292 Pac. 757.

We are of opinion that the findings of fact as made by the trial court are supported by sufficient competent evidence, and its conclusions of law based thereon are correct; that defendant's attempted sale of gas in violation of its contract with plaintiff will irreparably injure plaintiff's business and that the injury cannot be adequately compensated in money, and that the judgment of the trial court permanently enjoining defendant from violating its contract with plaintiff for the sale and delivery of gas from the Tull lease should be, and it is, affirmed.