**Raymond HENDERSON**

v.

**Mickey BENTLEY, Donald R. Welch, Glen Giles and City of Alcoa.**

**Civ. No. 3–80–236.**

United States District Court, E. D. Tennessee, N. D.

Sept. 17, 1980.

L. Caesar Stair, Knoxville, Tenn., for plaintiff.

Earl R. Layman, Thomas S. Scott, Jr., Knoxville, Tenn., Goddard & Gamble, Felknor & Cunningham, Maryville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiff filed this action under Title 42 U.S.C. § 1983 seeking relief for alleged violation of his constitutional rights in connection with his termination from the Alcoa, Tennessee Police Department. He claims that the hearing which he admittedly received did not comport with the requirements of the Due Process Clause of the Fourteenth Amendment. The defendants, the City and several of its officials, moved for dismissal or for summary judgment on the grounds that (1) plaintiff had no constitutional right to a pretermination hearing,

and (2) even if he did, he was afforded a full and fair opportunity to be heard which satisfied all constitutional requirements.[1]

The motion has been extensively argued and briefed. On July 1, 1980, the Court granted plaintiff's request to conduct further discovery on the fairness of the hearing and the impartiality of the City Manager who had presided. On August 20, the parties again appeared before the Court, and it was then determined that we should hear evidence on the issue of whether plaintiff's hearing complied with the requirements of due process. The practical effect of the Court's order of August 25, 1980, was to deny the motion and to allow the case to proceed to trial on the merits. The trial was had before the Court on September 10, 1980.

## I.

Most of the facts are not in substantial dispute. On April 13, 1980, plaintiff Raymond Henderson went to church worship services for approximately two and one-half hours while he was supposed to be on duty. Although he informed an officer at headquarters where he was going and left a phone number where he could be reached, he admits that he was out of radio contact during this time. While plaintiff was so occupied Lieutenant Glen Giles discovered plaintiff's absence. (Although Giles was on his day off at the time, he was nevertheless charged with general supervision of the shift during which the incident occurred.) It is undisputed that nobody tried to contact plaintiff at the telephone number he left, although Giles did try to reach him by radio. When plaintiff reported back to headquarters after the church service, he was informed by Giles that he had been suspended without pay for three days.

Plaintiff has admitted from the beginning that he in fact did go to church while on duty. He contends in his defense, however, that two other lieutenants knew of, and had condoned, his practice of attending church. He assumed, therefore, that it was not necessary to get permission on the day in question.

During plaintiff's period of suspension, City Manager Mickey Bentley was informed by Police Chief Don Welch of the incident and of plaintiff's defense.[2] City Manager Bentley caused Chief Welch to ascertain from the two lieutenants whether they had in fact condoned plaintiff's practice of attending church while on duty. Both lieutenants denied any knowledge of this practice.

By memorandum dated April 14, 1980 (Ex. 3), Chief Welch formally charged plaintiff with being absent from duty without leave, and informed the City Manager of two previous occasions when plaintiff had been found to be absent without leave. The Chief also recommended that plaintiff be terminated. The City Manager then instructed Chief Welch to ask for plaintiff's resignation and, if plaintiff refused, to advise plaintiff that he was entitled to a hearing and of his right to have an attorney.

Chief Welch carried out these instructions when plaintiff reported to work on April 16. On that occasion, Chief Welch also instructed plaintiff to turn in his equipment and to settle his accounts with the City credit union. This was apparently done on Chief

---

1. Defendants also argue that plaintiff has failed to exhaust his administrative or state remedies, and that the City of Alcoa cannot be held on a respondeat superior theory. Both of these contentions are without merit. Even if the remedies provided in T.C.A. §§ 27-901 et seq. are available to plaintiff (cf. § 27 914), there is no requirement that a plaintiff exhaust administrative or state remedies prior to filing a § 1983 action. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972). Further, due to the official nature of the actions at issue in this case, it is clear that the City of Alcoa may be held directly liable to plaintiff under Monell v. New York Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). See also, Owen v. City of Independence, 445 U.S. 622, 630-631, 100 S.Ct. 1398, 1405 1407, 63 L.Ed.2d 673 (1980).

2. Under the Charter of the City of Alcoa (Charter), the City Manager enjoys general authority to hire and fire all city employees. Art. 6, Section 1 of the Charter. The City Manager is the administrative head of the municipal government. Art. 7, Section 1 of the Charter.

Welch's own initiative. Plaintiff maintains that at the meeting Welch also informed him of a job opening at Southern Railway, but this is denied by Welch. Chief Welch admitted at the September 10 hearing that an officer who is merely being suspended is not normally asked to relinquish his equipment. Plaintiff thus assumed that he had been terminated as of April 16.

The following day, plaintiff filed a complaint with Lola Mae Reid, the president of the local chapter of the National Association for the Advancement of Colored People, informing her that he had been terminated. On April 18, Mrs. Reid and five other members of the Black community met with City Manager Bentley to ask him to reconsider his decision to terminate plaintiff. The evidence with respect to what transpired at this meeting is in sharp conflict and, because of its importance to the issues in this case, warrants some discussion.

Mrs. Reid testified both by affidavit and at the hearing that during the course of the meeting, Bentley flatly refused to consider probation or demotion rather than termination; that he stated that as far as he was concerned plaintiff was "finished," "through;" that Bentley reported to the group that he already had a replacement for plaintiff who was also Black and who would do a better job; and that Bentley said he had thought about the whole matter for three days and had made his decision. While Reid admitted that Bentley told the group that plaintiff would have a hearing, she said she left with the definite impression that Bentley's mind had been made up and that plaintiff had been finally terminated. Bentley, of course, denied that he had made up his mind about plaintiff prior to the hearing. He admits having told the group that he had a replacement in mind who was Black, but says he mentioned it only because he wanted to dispell any fears that might have been harbored by the group that plaintiff's discharge was racially motivated. Bentley says he never stated that plaintiff was "finished" or "through." He testified that he tried not to discuss the specifics of plaintiff's case, but that his purpose in meeting with the group was to inform them generally of the procedure with regard to disciplining an officer and the types of situations which might be considered in mitigation of plaintiff's offenses.

We find that the evidence does not support plaintiff's allegation that Bentley had made up his mind as of April 18, or at any time prior to the termination hearing held on April 30. Neither of the two other witnesses who had attended the meeting were able to testify that Bentley had used the words "finished" or "through" at the April 18 meeting. Mr. Warren testified that Bentley said that plaintiff had been suspended, and that he was entitled to a hearing. Warren also admitted on cross-examination that Bentley's statement regarding a replacement for plaintiff could have been intended only to assure the group that the City would retain the existing racial balance on the police force. It is also significant to note that the man Bentley had in mind, a Blount County Deputy Sheriff, was never hired by the City of Alcoa. Further, plaintiff testified that sometime after the meeting, but before the April 30 hearing, Bentley informed him over the telephone that he had not been terminated but only suspended.

Plaintiff's termination hearing was held April 30, 1980, a transcript of which, consisting of some 207 pages, is in the record. Plaintiff was charged with being absent from duty without permission of his supervisors on three separate occasions. Plaintiff was represented by an attorney, and had an opportunity to cross-examine witnesses and to call his own. City Manager Bentley presided over the hearing. Plaintiff admitted that he was absent on each of these occasions, but claimed that he had permission twice, and the third incident was a result of a scheduling misunderstanding. On May 5, 1980, Bentley sent a letter to plaintiff informing him of his decision to terminate plaintiff's employment effective May 30.

Plaintiff also says that Bentley met with the police force on the day following the

hearing and expressed some displeasure concerning the testimony he had heard the day before. The exact content of Bentley's remarks was not made clear. The transcript of the hearing fairly shows, however, that plaintiff's hearing was an emotionally charged event and that there was much testimony regarding an alleged practice among the policemen to run personal errands while on duty. We cannot say from the evidence that plaintiff has established that Bentley was chastizing the men because they did not say what he wanted to hear. We feel it equally likely that Bentley was upset at the practice revealed at the hearing and wanted to put it to a stop. The Court is of the opinion that this is a plausible explanation, and establishes no basis for disqualifying City Manager Bentley from considering plaintiff's case.

## II.

There are two main issues before the Court. The first is whether plaintiff was entitled to a pretermination hearing under the Fourteenth Amendment to the Constitution. If so, we must decide the second issue, namely whether the hearing he received comported with the requirements of Due Process.

## A.

■ We hold that under the Charter and Ordinances of the City of Alcoa, plaintiff was entitled to a pretermination hearing as a matter of constitutional law.

The issue turns on whether plaintiff enjoys a property interest in continued employment which is protected by the Due Process Clause of the Fourteenth Amendment. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).[3]

In *Roth, supra,* the Court stated:

Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—

rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. 408 U.S. at 577, 92 S.Ct. at 2709.

In *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the companion case to *Roth*, the Court found a " 'property' interest in continued employment" enjoyed by a non–tenured teacher based on a provision in the College's official Faculty Guide and certain guidelines promulgated by the Coordinating Board of the Texas College and University System. 408 U.S. at 600, 92 S.Ct. at 2699. The gist of these provisions was to assure the faculty member that his employment would continue as long as his work remained satisfactory. They expressly disclaimed the existence of any formal tenure. However, these provisions, the Court held, could give rise to "an unwritten 'common law' in a particular university that certain employees shall have the equivalent of tenure." *Id.* at 602, 92 S.Ct. at 2700.

A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. *Id.* at 601, 92 S.Ct. at 2700.

We believe these cases are controlling here. Plaintiff is a "classified" employee of the City of Alcoa (Ord. § 1–902(a)), who, having served for thirteen years, long ago attained "permanent" status. (Ord. § 1–902(3)). Chapter 5 of the Alcoa Ordinances, governing the police department, enumerates nine specific reasons for which a police officer may be suspended or discharged (Ord. § 1–501(5)), and explicitly provides that when charges are made against a police officer to the city manager, "it shall be the duty of the city manager" to cause notice and a hearing to be held, on three days' notice. "The said charges shall be tried and determined by the city manager. If the city manager shall find him guilty he shall discharge or discipline said person."

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

---

**3.** Neither party claims that plaintiff's due process rights stem from a liberty interest. *Cf.*

(Ord. § 1–501(4)).[4]  It seems clear that the ordinance contemplates continued employment until certain specific charges against a police officer can be established at a hearing before the city manager.  These are precisely the "rules or mutually explicit understandings" which give rise to a property interest protected by the Due Process Clause.  *See Roth; Perry, supra.*

*Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), on which defendants rely so heavily, is not to the contrary.  In that case, the Supreme Court held that a permanent employee of the Marion, North Carolina Police Department did not enjoy a property interest in continued employment.  The case is distinguishable in several important respects, however.  First, the ordinance on which the petitioner relied did not expressly provide for a hearing, but only for a warning and then written notice including the reasons for his discharge if he requested it.  426 U.S. at 344, n. 5, 96 S.Ct. at 2077, n. 5.

Further, the law in North Carolina was that "an enforceable expectation of continued public employment . . . [could] exist only if the employer, by statute or contract, [had] actually granted some form of guarantee.  *Still v. Lance*, 279 N.C. 254, 182 S.E.2d 403 (1971)."  *Id.* at 345, 96 S.Ct. at 2077.  Basing the existence of such a guarantee on the ordinance at issue, the Court (apparently with some reluctance, see 408 U.S. at 345–46, 96 S.Ct. at 2077–2078), deferred to the interpretation of the United States District Judge who had concluded that the petitioner held his position at the will and pleasure of the city.

Here, by contrast, the ordinance in question clearly provides on its face that a police officer can only be disciplined or discharged for certain enumerated reasons, and then only after the charges have been established at a hearing before the City Manager.  A clearer guarantee of the benefits of due process would be difficult to envision.

Defendant's argument that plaintiff's "permanent" status renders his employment one of "indefinite duration" and thus, under Tennessee law, terminable at the will of either party, is without merit.  The issue before this Court is one of Constitutional law rather than of contract law.

We hold that under the applicable ordinances of the City of Alcoa, plaintiff enjoyed a "property interest in continued employment," and was thus entitled to a pretermination hearing consistent with the requirements of due process.

### B.

■ The remaining issue is whether plaintiff's April 30 hearing was consistent with the requirements of due process.  We hold that it was.

Plaintiff argues first that the evidence shows that City Manager Bentley had already made up his mind to terminate plaintiff on April 18, and that the April 30 hearing was thus merely an empty formality.  Conceding such a situation would fall short of the requirements of due process, *see e. g., Texaco, Inc. v. FTC*, 118 U.S.App. D.C. 366, 336 F.2d 754 (1964), vacated on other grounds, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965), we have already found as a matter of fact that this was not the case.

Plaintiff's main argument is that because Bentley had some familiarity with the facts

---

4.  (4) Charges against any member of the police force other than those made by the city manager, must be made to the city manager, verified by the oath of the complainant, except that charges made by any member of the board of commissioners or the chief of police or recorder need not be in writing nor verified.  When charges are made, as above provided, it shall be the duty of the city manager to file said charges with the recorder, who shall summon said person, setting forth in the summons the nature of the charges made, to appear before the city manager and make defense thereto.  Three days shall be allowed the accused to prepare his defense.  The said charges shall be tried and determined by the city manager.  If the city manager shall find him guilty he shall discharge or discipline said person.  The recorder shall issue subpoenaes for, and the chief of police, or some member of the force, shall summon such witnesses as may be asked for by either party, and the accused may be represented by counsel.

of plaintiff's case, he should have disqualified himself from presiding over the hearing. The cases simply do not support this view.

Since plaintiff admitted that he had in fact been absent on each of the occasions charged, the City Manager needed only to determine how plaintiff was to be disciplined.[5] There were no adjudicative facts to be decided. Rather the decision was one of policy for which the City Manager was solely responsible. In this respect the case is indistinguishable from *Hortonville Joint School District v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

In the *Hortonville* case, the school teachers had gone on strike in violation of Wisconsin law after collective bargaining negotiations with the School Board had broken down. The striking teachers were summoned to appear before the same School Board for disciplinary hearings, and then terminated. While the teachers admitted being on strike, they sought to prove in mitigation that the Board had utilized unfair negotiating tactics. The teachers argued that because of the involvement of the Board in the negotiations, it was not sufficiently impartial to conduct the hearings, and that the Due Process Clause of the Fourteenth Amendment required an independent, unbiased decision–maker. The Wisconsin Supreme Court held that the Board's involvement in this respect was alone enough to disqualify it under the Due Process Clause.

The Court disagreed. It said that because the teachers had admitted being on strike in violation of Wisconsin law, the only decision remaining for the Board was the exercise of its discretion as to what sanctions should be imposed. 426 U.S. at 488, 96 S.Ct. at 2312. This was a policy decision squarely within the jurisdiction and expertise of the Board as designed by the state legislature.

The Court further stated:

Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not . . . disqualify a decision maker. [citations omitted.] Nor is a decision maker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not "capable of judging a particular controversy fairly on the basis of its own circumstances." 426 U.S. at 493, 96 S.Ct. at 2314.

We are of the opinion that this statement of law precisely covers the situation at hand. The City Manager has been vested by the City with plenary authority over police department personnel. (Ord. § 1–501). Although there is evidence that Bentley was familiar with the facts of plaintiff's case, and had even discussed the case with the community group at the April 18 meeting, plaintiff has not established that Bentley was so personally involved so as to be incapable of fairly judging the case. That the conduct of the police department may cast some reflection on Bentley's supervisory abilities does not, in itself, disqualify him from making policy decisions which affect the department or its members. *See Hortonville School District, supra*, 426 U.S. at 493, 496, 96 S.Ct. at 2314, 2316. Plaintiff has failed to "overcome a presumption of honesty and integrity in those serving as adjudicators." *See, Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *Hortonville School District, supra*, 426 U.S. at 497, 96 S.Ct. at 2316.

---

5. Plaintiff admits that he did not have explicit permission to leave his duty post on either October 27, 1979 or April 13, 1980, although he contends that he had implied permission on the latter date. See supra at 6. Although there is a factual dispute as to whether plaintiff was granted explicit permission to be absent from duty on May 29, 1979, there is no allegation that Bentley was familiar with that incident prior to April 14, 1980. Therefore, even assuming that the existence of adjudicative facts may be determinative at an involved decision–maker's eligibility to preside over a disciplinary hearing, see, Hortonville School District, supra, 408 U.S. at 495, 96 S.Ct. at 2315, the City Manager was nevertheless qualified to resolve that dispute.

Plaintiff relies on *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), in support of his disqualification argument. However, *Morrissey*, a case dealing with due process rights in a parole revocation context, "arose in a materially different context." *Hortonville School District, supra*, 426 U.S. 490, 96 S.Ct. at 2313.

> [E]ven if the property interest claimed here is to be compared with the liberty interest at stake in *Morrissey*, we note that both "the risk of an erroneous deprivation" and "the degree of potential deprivation" differ in a qualitative sense and in degree from those in *Morrissey*. *Id*. at 495, 96 S.Ct. at 2315.

For the foregoing reasons, we hold that plaintiff's April 30 hearing before City Manager Bentley fully complied with the requirements of the Due Process Clause.

### III.

We emphasize that the sole issue before this Court is, and has been, whether plaintiff was deprived of his due process rights. We have never intended, during the course of this litigation, to undertake to reexamine the merits of plaintiff's discharge. In this regard, we close with the words of Mr. Justice Stevens in *Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–2080 (1976).

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day–to–day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill–advised personnel decisions.

### IV.

For the foregoing reasons, it is ORDERED that this case be, and the same hereby is, dismissed.

Order Accordingly.