**AMOCO PRODUCTION COMPANY,**
Plaintiff and Counterdefendant,

v.

**KANSAS POWER & LIGHT COMPANY,**
Defendant and Counterclaimant.

Civ. A. No. 78–1089.

United States District Court,
D. Kansas.

Nov. 5, 1980.

On Remaining Issues Jan. 21, 1981.

James L. Grimes, Jr., of Cosgrove, Webb & Oman, Topeka, Kan., David S. Black, of Kansas Power & Light Co., Wichita, Kan., for defendant and counterclaimant.

## MEMORANDUM AND INTERIM ORDER

KELLEY, District Judge.

This matter comes now for decision on the plaintiff's claim for recovery of $2,884,-000.00 plus statutory interest pursuant to a gas sales contract dated April 18, 1960, as amended by the parties' Letter Agreement No. 22. During an in-chambers conference on September 29, 1980, the litigants, Amoco Production Company and The Kansas Power & Light Company (hereinafter referred to as Amoco and KP&L), agreed and stipulated, with encouragement from the Court, to bifurcate the trial of their case. It was thus agreed the plaintiff's claim set out above should be tried first to the Court and that the defendant's counterclaim and its defenses to the plaintiff's claim involving lack of consideration, breach of contract and unconscionability should be tried after the Court's decision regarding Amoco's claim. Both Amoco and KP&L then proffered their respective suggested findings of fact and conclusions of law with respect to the plaintiff's claim, and oral argument was heard on October 1, 1980. At this hearing, all of the exhibits attached to the parties' respective suggested findings of fact and conclusions of law (Plaintiff's Exhibits Nos. 1 through 57, and Defendant's Exhibits A through I) were admitted into evidence without objection.

In 1960, the parties entered into a gas sales contract. In 1975, they amended the contract pursuant to a provision in it allowing price redetermination every five years. This amendment, i. e., Letter Agreement No. 22, is the subject of the instant litigation. More particularly, the parties are in dispute over the meaning of part five of this amendment, which contains the following price escalator clause:

Should the Federal Power Commission, or a successor regulatory body, at any time during the term hereof, authorize a price, however determined, for interstate gas

Glenn D. Young, Jr., of Gott, Young & Bogle, P.A., Wichita, Kan., R. H. Landt, of Amoco Production Company, Denver, Colo., for plaintiff and counterdefendant.

sales within the geographical area in which the acreage subject hereto is located, which is higher than the price otherwise provided for in this amended Article XVI, then the price to be paid Seller hereunder shall be adjusted to the highest price so authorized.

This type of clause is generally known as a "price escalator clause" or a "F.P.C. price protection clause". This clause had no significance for the parties until July 27, 1976, the effective date for the Federal Power Commission's (hereinafter referred to as F.P.C.) Opinion No. 770. The relevant portions of F.P.C. Opinion No. 770 were reaffirmed by F.P.C. Opinion No. 770A issued November 5, 1976. *See*, (1979) Util.L.Rep.-Fed. (C.C.H.) Secs. 2302, 03 at pp. 3906–37. In these two F.P.C. opinions the former area pricing method for natural gas was abandoned in favor of a pricing scheme based on "vintaging". Opinions 770 and 770A set a ceiling price of $1.42/MCF for gas from wells commenced ("spud in") after January 1, 1975, a lower price for gas from wells spud in after January´1, 1973, and before December 31, 1974, and a price of 29.5¢/MCF for gas from wells spud in before January 1, 1973. In July of 1976, the price paid by KP&L to Amoco pursuant to other provisions of Letter Agreement No. 22 was 54.0¢/MCF. The parties are now in court because Amoco contends F.P.C. Opinion 770 triggered the above price escalator clause in Letter Agreement No. 22 and thus raised the price of gas sold to KP&L to $1.42/MCF. KP&L, in turn, contends the escalator clause was not put into effect by Opinion 770 because the contract price then being paid Amoco, 54.0¢/MCF, was already higher than the price set by F.P.C. Opinion 770 for pre-1973 gas sold in interstate commerce. All of the gas sold to KP&L by Amoco came from wells commenced before January 1, 1973.

An examination of Letter Agreement No. 22, and especially the F.P.C. price escalator clause in part five, does not appear to lead to confusion at first glance. Indeed, most laymen could understand its meaning. However, when paragraph five is applied to the circumstances existing after July, 1976,

an ambiguity becomes apparent. *See*, 4 Williston, Contracts, pp. 895–901 (3d ed., 1961). An ambiguity results because collateral facts exist, namely the F.P.C.'s adoption of vintaging and the demise of national pricing, and these facts make part five obviously ambiguous. When Letter Agreement No. 22 was signed on March 24, 1975, the F.P.C. employed a national price scheme to control gas prices. The concept of vintage pricing, as adopted in July, 1976 in F.P.C. Opinion 770, was a material deviation from the F.P.C. pricing policy existing when Letter Agreement No. 22 was formulated, and this deviation caused a potentially substantial price increase for KP&L due to the price escalator clause.

The plaintiff's claim is before the Court on the defendant's oral motion for summary judgment. After careful consideration of the parties' briefs, proposed statements of fact and oral argument, the Court finds part five of Letter Agreement No. 22 to be ambiguous. An examination of the extrinsic facts surrounding Letter Agreement No. 22 leads us to conclude that although the parties did not foresee nor provide specifically for F.P.C. Opinions 770 and 770A, they did clearly contemplate and provide for price escalation based on F.P.C. action and that "the price . . . shall be . . . the highest price so authorized". Consequently, we hold that judgment shall be entered in favor of Amoco on its breach of contract claim. The following are the Court's narrative findings of fact and conclusions of law.

The plaintiff is a Delaware corporation transacting business in the State of Kansas. The defendant is a Kansas corporation having its principal place of business therein. Amoco's business, among other things, involves the production and sale of natural gas. KP&L is a public utility company which buys natural gas for its own uses and also for eventual resale to its customers.

The gas sales contract entered into between the parties (Amoco was preceded by the Pan-American Petroleum Corp.) on April 18, 1960 (hereinafter referred to as the 1960 Contract) involved the sale of nat-

ural gas from wells all made operational prior to January 1, 1973. All of the wells are located in the Kansas counties of Haskell, Morton, Stanton and Stevens. The contract was originally for a term of twenty (20) years. In essence the 1960 Contract is an "output" contract whereby KP&L agreed to purchase all of the gas produced by Amoco from the acreage under contract up to a specified maximum and according to certain conditions not relevant to the matter before the Court. Until Letter Agreement No. 22 was agreed to by the parties in 1975, the 1960 Contract provided one price for gas to be used in KP&L's electrical power plants and another price for all other gas. The 1960 Contract also provided for price redeterminations every five years upon the request of Amoco.

The events giving rise to the present litigation began in 1973 when the parties began discussing the feasibility of price escalation on the condition that Amoco would rework certain gas wells to make additional gas reserves available to KP&L. The discussions carried into 1974. By letter dated May 7, 1974, Armour of Amoco gave written notice to KP&L that Amoco sought a redetermination of the contract price of gas from January 1, 1975 through December 31, 1980 pursuant to Section 4, Article XVI of the 1960 Contract. On May 9, 1974, Armour of Amoco again wrote to Benignus of KP&L regarding the possibility of Amoco's increasing reserves in exchange for price upgrading, and in this letter Armour stated such an agreement would only be effective to January 1, 1975, because new prices resulting from Amoco's redetermination request would be effective then. Williamson of KP&L responded to Armour's letter of May 7, 1974 regarding a price redetermination request and suggested the parties' price redetermination negotiations also include the subject of price upgrading for additional reserves.

On June 24, 1974 Benignus of KP&L by telephone notified Clayton Meadows of Amoco that KP&L did not want to agree to price increases prior to January 1, 1975 in exchange for Amoco's reworking existing gas wells to increase reserves. However,

the possibility of Amoco reworking existing wells or drilling new ones to increase gas available to KP&L remained a part of the parties' negotiations of a price redetermination effective January 1, 1975. Williamson of KP&L mentioned this factor to Armour of Amoco in a July 31, 1974 letter summarizing the discussions of representatives of the parties on July 25, 1974. Nevertheless, a requirement that Amoco must rework existing wells or drill additional wells to increase gas supplies to KP&L was not made a condition in the writing culminating the parties' price redetermination negotiations, Letter Agreement No. 22, signed March 24, 1975. Also, Amoco in fact never reworked nor drilled any new wells from which to sell additional gas to KP&L.

Before further discussion of the dispute between Amoco and KP&L, a short history of vintaging is helpful. An enlightening historical discussion of vintaging was provided by Judge Barrett in his concurring opinion in *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1291 (10th Cir., 1979). Vintaging is a method of price control in which prices are determined by taking into account the costs of production and exploration for gas from wells commenced in the past and for gas explored for and produced today. The history of vintaging in the regulatory field reveals it has not always been the favored means of price control. The F.P.C.'s (now the Federal Energy Regulatory Commission) first price control theory was the "prudent investment approach" which attempted to take into account the individual producer's legitimate costs. This method was affirmed by the Supreme Court in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

Due to the unwieldiness of this individualistic method, it was abandoned in 1960 by the Commission. *Phillips Petroleum Co.*, 24 F.P.C. 537 (1960), *aff'd Wisconsin v. Federal Power Comm.*, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963). Instead, the F.P.C. opted for the "area rate" approach based on the costs in general of the industry for the various gas producing areas of the

country. Furthermore, the Commission, pursuant to 24 F.P.C. 537, eventually set two prices for each such area, one price for new contracts and another for existing contracts. *Id.* 373 U.S. at 298–99, 83 S.Ct. at 1269, 10 L.Ed.2d at 362. Thus, the price control method of "vintaging" according to contract date was developed in the natural gas industry starting in 1960. *See, Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1293 (10th Cir., 1979) (concurring opinion, J. Barrett). The F.P.C. in 1965, after extensive hearings, set two gas rates according to the vintage of wells. 34 F.P.C. 159 and 1068. The concept of vintage pricing was thereafter approved by the Supreme Court in the *Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

A few years later in 1972, the F.P.C. reversed its policy and deserted the concepts of contract vintaging and area pricing in Opinion 639. 48 F.P.C. 1299 (1972). *Shell Oil Co. v. Federal Power Comm.*, 491 F.2d 82, 84 (5th Cir., 1974). Instead, in 1974 the F.P.C. went on in Opinion 669 to set a national rate for natural gas. This action was judicially approved in *Shell Oil Co. v. Federal Power Comm.*, 520 F.2d 1061 (5th Cir., 1975) cert. denied, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). However, the F.P.C. ended its experiment with a uniform national rate by promulgating Opinion 770 on July 27, 1976, in which it readopted the vintaging approach. *American Pub. Gas Ass'n v. Federal Power Comm.*, 567 F.2d 1016 (5th Cir., 1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). At best, the above history of vintaging reveals it has received only reluctant acceptance by the F.P.C., and consequently the Court finds the parties did not foresee the F.P.C.'s return to vintage pricing in 1976 when Letter Agreement No. 22 was executed in March, 1975.

■ As was noted earlier, the question being addressed in this opinion involves the meaning of the price escalator clause in part five of Letter Agreement No. 22. Amoco argues part five of this agreement is clear on its face. KP&L in turn counters by contending the escalator clause is ambiguous. KP&L consequently would have us consider all relevant extrinsic evidence and then interpret the escalator clause to provide for increases in price only to the level which would be obtained by Amoco if the contract gas were subject to F.P.C. control. Given this dispute, the Court is required to determine the intent of the parties with respect to this clause. *See, Texaco, Inc. v. Holsinger*, 336 F.2d 230, 233 (10th Cir., 1964); *Mobile Acres, Inc. v. Kurata*, 211 Kan. 833, 838, 508 P.2d 889 (1973); 4 Williston, Contracts § 600 (3d Ed., 1961).

■ The Court's analysis thus pivots on whether the price escalation clause is ambiguous. A clear and unambiguous contract must be interpreted solely within its "four corners". However, if an instrument is ambiguous, then the circumstances existing prior to and contemporaneously with the contract's execution can be examined. *Amortibanc Investment Co. v. Jehan*, 220 Kan. 33, 43, 551 P.2d 918 (1976); *Martin v. Edwards*, 219 Kan. 466, 473, 548 P.2d 779 (1976). We note the Uniform Commercial Code as adopted in K.S.A. 84–2–202 (1966) allows extrinsic facts to explain or supplement a contract without a finding that a contract is ambiguous. Since the Court finds the escalator clause ambiguous, the above statute is inapplicable here.

■ The Court's examination of extrinsic facts may include acts of the parties subsequent to execution of Letter Agreement No. 22 to shed light on the question of intent. *See, First Nat. Bank v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979); 4 Williston, Contracts § 623 (3d Ed., 1961); 30 Am.Jur.2d *Evidence* § 1072 (1967). Consequently, even though it later withdrew its rate application, the Court is impressed that on or about January 3, 1977, KP&L filed a rate application with the Kansas Corporation Commission (KCC) seeking authorization to pass on its increased costs due to the ceiling price allowed by the F.P.C. in Opinions 770 and 770 A. Thus, KP&L's intention originally was that the price escalator clause was activated by the above F.P.C. Opinions. It was only after KP&L's offi-

cials met with officials of the KCC on January 27, 1977, after the application had been filed, that KP&L decided to argue its present interpretations of Letter Agreement No. 22. KP&L withdrew its application on March 3, 1977.

A study of the rough drafts of Letter Agreement No. 22 reveals that both sides had equal input to the final draft. KP&L especially worked over part five. Indeed, in an internal letter from Balfour Jeffery, then president of KP&L, to Williamson, a KP&L principal in the contract negotiations on September 27, 1974, he expressed his discomfort with an indefinite price escalator clause because it was too indefinite. He was obviously concerned with the possible adverse reaction of the K.C.C. to the triggering of the escalator clause: "Also, it leaves us subject to [Kansas Corporation] Commission criticism that we have surrendered all bargaining and have automatically accepted the most adverse type of price determination." (Docket No. 27, Plaintiff's Exhibit 16). Mr. Jeffery had proposed the elimination of this clause. Thus KP&L was clearly aware of the potential price increases the escalator clause opened up, but it accepted these risks as part of the bargain.

During the negotiations prior to execution of Letter Agreement No. 22, KP&L's Williamson in correspondence with Balfour Jeffery dated January 3, 1975, again exhibits KP&L's awareness that Amoco bargained for new contract prices (50¢/MCF) which were higher than the FPC rate for post-1973 gas during these negotiations. This reveals the parties intended the contract price to be higher than what the F.P.C. would have allowed if the same gas were sold in the interstate market. This conclusion is supported by the statement of Benignus, another KP&L principal in the negotiations, in his letter dated March 5, 1975 to Clayton Meadows of Amoco in which Benignus acknowledges a price escalation triggered by F.P.C. action "would be rather sizable". Indeed, KP&L provided in Letter Agreement No. 22, part five, the ability to spread this amount over a six-month period.

Amoco's steadfast position regarding the price escalation clause has been that pursuant to the escalator clause it was entitled to "the highest price so authorized" by the F.P.C. Amoco's policy, as expressed in a May 2, 1972 letter to J. D. Armour, a principal negotiator for Amoco in the instant case was to bargain for any kind of price protection clause so that the company was safeguarded "with the rapidly changing gas marketing conditions".

Through editing the escalator clause it can be reduced to: "Should the Federal Power Commission ... at any time ... authorize a price, *however determined* ... which is higher than the price otherwise provided for ..., then the price to be paid Seller shall be ... the highest price so authorized." (Emphasis added). A reading of the words "however determined" without resort to extrinsic evidence would support a conclusion that any price set by the F.P.C. higher than the contract price would automatically trigger the escalator clause. It is undisputed, however, that the words "however determined" were not included in the contract in contemplation of the F.P.C.'s subsequent three-tier pricing scheme. Thus, the Court finds "however determined" to be of no consequence.

In finding in favor of Amoco, the Court is not unmindful of the strict construction arguments raised by KP&L. Nor is the Court unmindful that natural gas is an essential commodity for consumers and consequently the public interest is involved in this lawsuit. As Judge Brown has stated, contracts involving the public welfare are generally construed in the public's favor. *U. S. v. Kansas Gas & Elec. Co.*, 215 F.Supp. 532, 542 (D.C.Kan., 1963). The type of price escalation clause found in Letter Agreement No. 22 is subjected to close scrutiny. *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1296 (10th Cir., 1979) (concurring opinion by J. Barrett).

Nevertheless, the extrinsic facts surrounding the execution of Letter Agreement No. 22 clarify the parties' intention that F.P.C. action setting a ceiling price for

natural gas higher than the contract price would trigger the escalator clause in part five. To hold otherwise would be rewriting the parties' contract based on strict constructionist arguments, and this the Court cannot do. *Potter v. Northern Nat. Gas Co.*, 201 Kan. 528, 441 P.2d 802 (1968). "The courts interpret contracts as made by the parties and do not make new ones for them." *Quad Construction, Inc. v. Wm. A. Smith Contracting Co.*, 534 F.2d 1391, 1394 (10th Cir., 1976). *See*, 17 Am.Jur.2d Contracts § 242 (1964).

Cases involving indefinite price escalator clauses in natural gas contracts are not numerous. However, the Tenth Circuit has recently decided three such cases. The most recent case was decided in March of this year. *Premier Resources, LTD. v. Northern Nat. Gas Co.*, 616 F.2d 1171 (10th Cir., 1980), cert. denied —— U.S. ——, 101 S.Ct. 92, 66 L.Ed.2d 31 involved the review of a gas contract between a pipeline company and a small gas producer. Although this case is not directly on point with the litigation at hand, an analogous situation was present. In *Premier Resources* the parties included a contingency clause in the price redetermination section of the contract to provide for the U. S. Supreme Court's decision on F.P.C. Opinion 428 and possible subsequent F.P.C. action. Both parties had anticipated the decision by the Court of Appeals for the District of Columbia invalidating Opinion No. 428 in *Texaco, Inc. v. Federal Power Comm.*, 474 F.2d 416 (D.C. Cir., 1972) would be affirmed by the U. S. Supreme Court. However, "the Supreme Court caught them by surprise in that it vacated the existing system . . .". *Premier Resources, LTD v. Northern Nat. Gas Co.*, 616 F.2d 1171, 1180 (10th Cir., 1980). *See, Federal Power Comm. v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Even more surprising to the parties to the contract was the F.P.C.'s immediate subsequent action in Opinion No. 742A in setting national rates and allowing small producers a substantially higher rate than that allowed large producers. *Premier Resources, LTD. Id.* Neither side had anticipated the surprising turn of events subsequent to the execution of their contract nor included specific provisions in their contract for these events. Notwithstanding, the Court of Appeals held despite the parties' surprise, the contingency clause was unambiguous and was triggered by the F.P.C. action allowing the seller, Premier Resources, LTD, to charge a rate higher than the contract price.

The above case is analogous because both Amoco and KP&L were surprised by the F.P.C.'s adoption of vintage pricing in Opinions 770 and 770A, given the F.P.C.'s earlier rejection of vintage pricing. Nevertheless, the price escalator clause in Letter Agreement No. 22 is made clear upon examination of extrinsic evidence, and it is held Opinion 770 triggered the price escalator clause.

The second relevant Tenth Circuit case involving a natural gas contract is *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281 (10th Cir., 1979). This case involved the review of a "favored nations" clause, a type of price protection clause to be litigated later in this case. A "favored nations" clause operates to raise the contract price of gas to equal the price paid by the buyer to any other seller. There was no specific provision allowing price acceleration based on F.P.C. action. The Court of Appeals refused to read vintaging into the parties' contract, as urged by the buyer, because the parties had not contemplated vintaging when the contract was signed in 1964. The buyer argued as KP&L does here, that it should only be required to pay the price allowed by the F.P.C. for the same vintage gas sold in the interstate market. This argument was clearly rejected. We also note the Court of Appeals agreed that the true value of gas was not directly related to cost of production but rather to the traditional concepts of supply and demand. *Id.*, at 1291, n.15.

The case closest to the one at hand is a 1980 Wyoming Supreme Court case, *Amoco Production v. Stauffer Chem. Co. of Wyoming*, 612 P.2d 463 (1980). The price acceleration clause there was similarly tied to F.P.C. action:

12.3 If at any time and from time to time during the term hereof, the Federal Power Commission or any successor governmental agency shall at any time hereafter prescribe or approve a ceiling price or prices, however determined, which is generally applicable to gas being sold from the area in which the gas subject hereto is sold, which when adjusted for heating value, is higher than the then applicable price under Section 12.1 or Section 12.2 hereof, the price of gas sold hereunder shall be increased to equal such higher price effective on the date such price is prescribed or approved.

*Id.* at 464. Both sides argued the contract was unambiguous, and no resort to extrinsic evidence was made. The Wyoming Supreme Court deduced from analyzing this clause that the intention was to escalate the price to the highest price approved by the F.P.C. The Court held it would not rewrite the contract, as urged by the buyer, to include vintaging, because it was not contemplated by the parties when the contract was executed.

The final recent Tenth Circuit case involving a pricing clause tied to F.P.C. regulations is *C. F. Brown & Co., v. Oklahoma Gas & Elec. Co.*, 603 F.2d 132 (10th Cir., 1979). Here the Court of Appeals agreed with the trial court that the clause was unambiguous despite the fact that after the contract was executed the F.P.C. changed its pricing schemes from area pricing to national pricing. Though extrinsic evidence has been considered in the case now before the Court, but correctly was not in *C. F. Brown & Co.*, this case nevertheless bolsters our view that paragraph five of Letter Agreement No. 22 is not unclear after examination of collateral facts.

The case most helpful to KP&L's position is *North Central Airlines, Inc., v. Continental Oil Co.*, 574 F.2d 582 (10th Cir., 1978). Involved here was a contract for aviation fuel containing an indefinite price escalator clause tied to the changing "posted price" of crude oil. Subsequent to the contract's execution, the Federal Cost of Living Council set two-tier oil prices based on an "old

oil" and "new oil" concept. The Court of Appeals held the contract's pricing mechanism, as described above, failed because of the subsequent action by the Cost of Living Council. Consequently, the Court determined Section 2–305(1) of the Uniform Commercial Code applied and upheld the contract but remanded the case to decide what a "reasonable Price" would be. *Id.*, 574 F.2d at 592–3. However, *North Central Airlines* is distinguishable from the case at hand because both Amoco and KP&L intended their contract price to rise to the "highest price so authorized" by the F.P.C., and neither side, when Letter Agreement No. 22 was executed in March, 1975, contemplated nor intended vintaging to play a part in their contract.

In the final analysis, it is concluded the intention of the parties, as expressed in Letter Agreement No. 22, was to escalate the contract price of gas to the "highest price so authorized" by the F.P.C. Later disagreement by the parties to a contract regarding its meaning does not necessarily mean the contract is unclear. *Homestake-Sapin Partners v. United States*, 375 F.2d 507 (10th Cir., 1967).

For the preceding reasons, Amoco Production Company is entitled to its claim for relief, and the defendant's summary judgment motion is denied, because the Kansas Power and Light Company has breached the parties' contract. Determination of the damages owed Amoco is postponed until the remaining issues in this case are disposed of.

IT IS THEREFORE ORDERED that hearing on the remaining issues is set for the 25th day of November, 1980, at 10:00 a. m., with status conference scheduled at 9:30 a. m., on even date. These issues are whether "favored nations" clauses are unconscionable and void for public policy reasons, whether Letter Agreement No. 22 fails for lack of consideration, and whether there was an underlying contract entered into by the parties regarding the reworking of certain gas wells by Amoco. Counsel are required to submit trial briefs and any additional findings of fact and conclusions of

law they deem appropriate on or before the 21st day of November, 1980.

## On Remaining Issues

This matter comes now for decision on the second part of this bifurcated litigation between the parties. On November 5, 1980, this Court held in favor of the plaintiff, Amoco Production Company (Amoco), on its breach of contract claim against the defendant. Now before the Court are certain issues raised by the defendant and counterclaimant, the Kansas Power and Light Company (KP&L). These issues include whether "favored nations" clauses in natural gas contracts are unconscionable and void for public policy reasons, and whether the parties' written agreement setting new gas prices failed for lack of consideration. Both Amoco and KP&L have proffered their respective briefs and suggested findings of fact on these points, and oral argument was heard December 8, 1980. At this hearing all of the exhibits referred to in the parties' respective findings of fact and conclusions of law (Plaintiff's Exhibits Nos. 58 through 72, and Defendant's Exhibits Nos. A through X) were admitted into evidence without objection.

The Memorandum and Interim Order dated November 5, 1980, sets out the basic facts involved in this case. They are repeated again here and will be supplemented as required in this final memorandum opinion. Amoco and KP&L are parties to a gas sales contract signed in 1960. Pursuant to a clause in it permitting a price redetermination every five years at the seller's request, the parties began negotiations culminating March 24, 1975, into Letter Agreement No. 22, the focus of the instant litigation. At issue in the first part of this case was the proper legal interpretation of part five of this amendment containing the following price escalation clause:

> Should the Federal Power Commission, or a successor regulatory body, at any time during the term hereof, authorize a price, however determined, for interstate gas sales within the geographical area in which the acreage subject hereto is located, which is higher than the price otherwise provided for in this amended Article XVI, then the price to be paid Seller hereunder shall be adjusted to the highest price so authorized.

In the first half of this bifurcated case we held, as was argued by Amoco, that the above price escalator clause was triggered on July 27, 1976, the effective date of Opinion No. 770 of the Federal Power Commission (F.P.C.). Opinion 770 was subsequently reaffirmed by the F.P.C. on November 5, 1976, in Opinion 770A. *See*, (1979) Util.L. Rep.—Fed. (C.C.H.) Secs. 2302, 03 at pp. 3906–37.

This Court found that the escalator clause contained in Letter Agreement No. 22 was ambiguous, because in Opinion 770 the F.P.C. authorized three different prices for natural gas according to its "vintage," i. e., when the gas well was drilled. The lowest price authorized by Opinion 770, 29.5¢/MCF, was for gas wells drilled before January 1, 1973. The highest authorized price, $1.42/MCF, was for gas from wells commenced ("spud in") after January 1, 1975. In July, 1976, KP&L was paying Amoco 54.0¢/MCF pursuant to Letter Agreement No. 22. All of the gas purchased by KP&L from Amoco came from wells spud in prior to 1973. Nevertheless, after this Court's examination of the negotiations between Amoco and KP&L leading up to Letter Agreement No. 22, we held that the parties intended the escalator clause to be triggered if the "highest price so authorized" by the F.P.C. was higher than the current contract price. Consequently, the Court determined F.P.C. Opinion 770 activated the escalator clause and the contract price was thus elevated to $1.42/MCF.

Essentially two issues remain to be decided now. The first is whether the price escalator clause in part five of Letter Agreement No. 22, which is a type of "favored nations" clause, is unconscionable in that it causes a dramatic 263% increase in the cost of gas without any relations to its cost of production.

The second issue to be decided is whether there was a separate agreement between

the parties underlying Letter Agreement No. 22 regarding the reworking of gas wells by Amoco for KP&L's benefit. KP&L contends such an underlying agreement existed and that it constituted part of the consideration for Letter Agreement No. 22. If there was such an agreement, then Letter Agreement No. 22 fails for lack of consideration, because it is agreed Amoco never reworked any of the wells.

These issues are now before the Court on each party's motion for summary judgment. After careful consideration of the parties' excellent briefs, proposed statements of fact and oral argument, the Court finds that the price escalator clause is not unconscionable nor against public policy, and that the parties' discussions regarding the reworking of certain gas wells never culminated into an underlying agreement forming a consideration for Letter Agreement No. 22. Consequently, final judgment shall be entered in favor of Amoco on its breach of contract claim against KP&L. The following are the Court's narrative findings of fact and conclusions of law. The Memorandum and Interim Order in this case dated November 5, 1980, are of course incorporated herein by reference.

Before reviewing the treatment of "favored nations" clauses in prior court decisions, a discussion of their function would be appropriate. Generally there are two types of "favored nations" clauses: two-party clauses and third-party clauses. *See,* 4 Williams, Oil and Gas Law, Section 726 (1972). A two-party favored nations clause generally provides that the price to be paid by the buyer will automatically escalate to match any higher price which the buyer has agreed to pay any other seller for gas produced in the same area or field. In contrast, a third-party favored nations clause in a natural gas contract will generally provide that the price to be paid by a buyer shall escalate to equal any higher price for gas obtained by any seller from any buyer in the same area or field. Since the escalator clause contained in part five of Letter Agreement No. 22 is keyed to price setting by the F.P.C., a stranger to the contract between Amoco and KP&L, this Court

deems it a type of third-party favored nations clause.

For various reasons, KP&L contends the favored nations clause in Letter Agreement No. 22 is unconscionable, against the public's interest and that this Court should excise it from the contract applying the Uniform Commercial Code provision dealing with unconscionable contract provisions. *See,* K.S.A. 84–2–302 (1965). Simply stated, KP&L argues the indefinite price escalator clause is unconscionable because in the context presented here it would operate to give Amoco a dramatic windfall price increase unrelated to any increase in Amoco's cost of production for a commodity essential for the public's well-being. Favored nations clauses favor sellers of natural gas and are subjected to close scrutiny by the courts. *Superior Oil Co. v. Western Slope Gas Co.,* 604 F.2d 1281 (10th Cir. 1979) (concurring opinion, J. Barrett).

Favored nations clauses, i. e., indefinite price escalator clauses, are at least partially the result of regulations of the federal government requiring gas producers in the interstate market to dedicate their supplies for long periods of time. 4 Williams, Oil and Gas Law, § 726 (1977). However, these clauses have not been met with total approval by the F.P.C. (the predecessor of the Federal Energy Regulatory Commission) nor the Courts. In 1971, the F.P.C. entirely forbade favored nations clauses in interstate gas contracts signed on or after April 3, 1961. *See,* F.P.C. Opinion No. 341, 25 F.P.C. 383 (1961); aff'd, *Pure Oil Co. v. Federal Power Comm.,* 299 F.2d 370 (7th Cir. 1962). In reviewing and approving the F.P.C.'s decision in 34 F.P.C. 159 (1965), which allowed indefinite escalator clauses to effect price hikes no higher than the area maximum rates then allowed by the F.P.C., the United States Supreme Court stated:

Indefinite escalation clauses cause price increases ... to occur without reference to the circumstances or economics of the particular operation, but solely because of what happens under another contract. 34 FPC at 373. There is substantial evi-

dence that in design and function they are 'incompatible with the public interest ....' Order No. 232, 25 F.P.C. 379, 380. *Permian Basin Area Rate Cases*, 390 U.S. 747, 782-3, 88 S.Ct. 1344, 1367-68, 20 L.Ed.2d 312, 345 (1968). Not surprisingly, these clauses are generally construed by the courts in the buyer's favor and against the seller. *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1295 (10th Cir. 1979) (concurring opinion, J. Barrett).

Recently, the Tenth Circuit Court of Appeals had before it for consideration the issue of whether favored nations clauses are unconscionable and against public policy. *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d at 1285. Accompanying the majority opinion is a lengthy concurring opinion by Judge Barrett in which he analyzed the effects of vintage pricing on favored nations clauses in intrastate gas contracts. Judge Barrett concluded "that the courts may be justified in declaring the 'favored nations' clause here in question void as against public policy." *Id.* at 1297. Nevertheless, the majority opinion in this case does not contain a finding that such clauses are unconscionable, although the majority could theoretically have made such a finding. Instead, the Court of Appeals remanded the case for further findings regarding the correct legal interpretation of the favored nations clause in issue there. *Id.* at 1291. This Court considers the Tenth Circuit's majority opinion in *Superior Oil Co.* to mean favored nations clauses are not *per se* unconscionable.

The case most clearly supportive of KP&L's arguments here is a very recent decision from the Wyoming Federal District Court. *Kerr-McGee Corp. v. Northern Utilities, Inc.*, 500 F.Supp. 62 (D.Wyo.1980). By coincidence Amoco was also a party in that case and provided lead counsel for the gas producers. At issue was a type of third-party favored nations clause agreed to between Northern Utilities, Inc. and Amoco on October 1, 1970:

(b) From and after January 1, 1976, when the price to be paid by Northern [Utilities, Inc.] to [Amoco] pursuant to the other provisions hereof is less than the sum of the price received for gas being sold in interstate commerce, by any other producer within the State of Wyoming, ..., then Northern shall increase the price to be paid [Amoco] hereunder to a price equal to the price being received by such producer plus three cents per Mcf.

*Id.* at 628. The gas producers in this case all had similar contracts with the plaintiff, a public utility, and they argued the above price escalation clause was triggered as of January 1, 1977. The producers based their contentions on F.P.C. Opinion No. 669-H (effective June 21, 1974), which raised the maximum base rate for interstate gas from wells drilled after January 1, 1973, to 50¢/MCF; F.P.C. Opinion No. 742 (effective August 28, 1975), which allowed small producers to charge 130% of the maximum base ceiling rate allowed large producers for interstate gas; F.P.C. Opinion No. 770 (effective July 27, 1976), which raised the maximum base rate for interstate gas from wells drilled on or after January 1, 1975, to $1.42/MCF; and the Natural Gas Policy Act of 1978 (effective December 1, 1978), which raised the ceiling price for "new" natural gas from the field supplying the plaintiff utility to $2.80/MCF as of June, 1980, when this case was tried. Since all of the gas provided by Northern Utilities' contracts was intrastate, they were not subject to federal price controls. If the relevant federal price controls applied, then the quoted price escalation clause would not have been triggered, since none of the defendant producers qualified as "small producers" under Opinion No. 742, and all of the gas supplied the plaintiff came from wells drilled prior to 1973.

Unlike KP&L, Northern Utilities agreed to pay the price escalations demanded by the gas producers until it could either work out a settlement or obtain a court decision on the price question. *Id.* at 631-32. The effect of·the price escalation for the customers of Northern Utilities, Inc. was dramatic. Between December, 1975, and April, 1980, a period of slightly over four years, the price rose from 28¢/MCF to $2.80/MCF.

This represented a ten-fold increase over what would have been the contract price for the gas. As a consequence, a monthly gas bill of $30.00 had been increased to approximately $250.00. *Id.* at 633.

The trial court in *Kerr-McGee Corp. v. Northern Utilities, Inc.* found the above-quoted price escalation unconscionable, against public policy, and the Court excised it from the parties' contract while upholding the remainder of the contract. Furthermore, the trial court found the gas producers intended the favored nations clause to achieve an inequitable and oppressive result, i. e., an exorbitant windfall price for gas completely unrelated to its cost of production. *Id.* at 634 and 636.

■ The strongest support for KP&L's unconscionability arguments is *Kerr-McGee Corp. v. Northern Utilities, Inc.*, and this Court does not disagree with the findings in that case given the circumstances presented there. However, the above case is not controlling here, and because the facts at hand in the present lawsuit between KP&L are different, this Court has reached a different result. Unlike the situation in *Kerr-McGee Corp. v. Northern Utilities, Inc.*, where the gas producers alone supplied the problematic escalator clause, KP&L had substantial input into the drafting of the favored nations clause in part five of Letter Agreement No. 22. As noted on page eight of this Court's interim findings, KP&L was aware before agreeing to the favored nations clause that it could cause sizeable price increases. Also, the price increase for KP&L amounts to slightly more than a two and one-half fold escalation, not an insubstantial increase, but it is not nearly as dramatic as the ten-fold increase sought by the producers in *Kerr-McGee Corp. v. Northern Utilities, Inc.* The favored nations clause in Letter Agreement No. 22 was activated for a much shorter period of time—from July 27, 1976 (the effective date of Opinion No. 770) to December 31, 1977, when the parties agreed in Letter Agreement No. 23 to a new price of $1.77/MCF. The escalator clause in the *Kerr-McGee Corp. v. Northern Utilities, Inc.* case would

have operated for twenty years, until December 31, 1990, or until 1985 if the Natural Gas Policy Act of 1978 should operate to deregulate the price of gas under the contract.

■ This Court is reluctant to find the favored nations clause in Letter Agreement No. 22 unconscionable, because ultimately it must be recognized that in March, 1975, when this agreement was executed, gas prices had already begun to rapidly escalate. Indeed, very illustrative of this trend is the price hike which took place when Letter Agreement No. 22 was signed in March, 1975. In this document, KP&L agreed to a new redetermined contract price of 53¢/MCF which was approximately a 144% jump over the old contract price. Furthermore, in the Natural Gas Policy Act of 1978 (Pub.L. No. 95–621), Congress expressed a policy of eventually allowing prices to go unregulated by the year 1985. This was noted by the Tenth Circuit Court of Appeals. *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1291 n. 16 (10th Cir. 1979). By 1985, the price of deregulated natural gas will assuredly seem exorbitant, and since it is such an essential commodity for most of the public, hardship will result. Nevertheless, this Court must be cognizant of these developments in public policy. The price of deregulated gas will be determined by supply and demand rather than the cost of production. *See, Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1291 n. 15 (10th Cir. 1979). Consequently, this Court finds unpersuasive the defendant's contentions that the favored nations clause in Letter Agreement No. 22 is unconscionable because it is unrelated to production cost factors. Cost of production is no longer the sole determinative factor in arriving at a fair price.

This Court is not unmindful of the likelihood that the extra cost increase caused by the favored nations clause in Letter Agreement No. 22 will ultimately be borne by KP&L's customers and that many will lack the financial resources to pay the extra cost. However, the impact of such increases in home heating costs upon low income

households is softened by the Low-Income Energy Assistance Program operated by the State of Kansas and funded through the Crude Oil Windfall Profit Tax Act of 1980 (P.L. 96–223). According to the Senate report, Kansas was allotted over $28,-000,000 to aid low income households during fiscal year 1980. (S.Rep.No.96–394, 96th Cong., 2nd Sess. 115–16, *reprinted in* [1980] U.S.Code Cong. & Ad.News, pp. 1008, 1122–23). This large scale assistance program assuages the bite of increasing natural gas costs into low income budgets and also negates KP&L's unconscionability arguments.

The doctrine of unconscionability was originally a creature of the law of equity and was strengthened in Kansas when the legislature adopted the Uniform Commercial Code. However, this doctrine has usually been invoked in situations involving "one-sided, oppressive and unfairly surprising contracts and not against the consequences *per se* of uneven bargaining power or even a simply old-fashioned bad bargain [cite omitted]." *Willie v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 759–60, 549 P.2d 903, 907 (1976). In this case, the Kansas Supreme Court noted a contract is not unconscionable unless there is unequal bargaining power as well as some other factor such as deceptive bargaining conduct. *Id.*, 219 Kan. at 759, 549 P.2d at 907. KP&L is a publicly owned corporation principally doing business in Kansas. Although it may be dwarfed in size by Amoco, KP&L is a relatively large business enterprise and thus not the type of litigant that usually seeks the shield of unconscionability. Consequently, we do not find KP&L suffered from such inequality of bargaining power nor that such an unfair or inequitable price rise resulted from the triggering of Letter Agreement No. 22 that the favored nations clause must be declared unconscionable.

■ The final major issue in this case is whether there was a separate agreement between the parties regarding the reworking of certain gas wells for KP&L's benefit which formed part of the consideration for Letter Agreement No. 22. If such an agreement was part of the agreed upon consideration for Letter Agreement No. 22, the agreement is unenforceable for Amoco never reworked the wells.

The parties first communicated regarding the possibility of Amoco's reworking or redrilling existing wells as early as the fall of 1973. The preliminary discussions are illustrated in a letter by Armour of Amoco to KP&L dated October 16, 1973. In this correspondence Amoco stated redrilling would not be economically feasible unless KP&L agreed to a price increase. Communication on this subject continued between the parties by telephone and letter through the remaining months of 1973 and into the spring of 1974. By a letter dated May 7, 1974, Amoco notified KP&L that Amoco desired to obtain new higher gas prices for the period between January 1, 1975, through December 31, 1980, pursuant to a redetermination clause providing for price renegotiations every five years in the parties' 1960 contract. Prior to this point the parties had been negotiating toward an agreement providing higher prices in exchange for increased gas supplies which was separate and distinct from the price redetermination Amoco now sought pursuant to the 1960 contract. Under the 1960 contract Amoco had the right to seek a redetermined price without changing any of its 1960 contract obligations. After Amoco notified KP&L it desired a price redetermination under the 1960 contract, the parties still considered the possibility of an agreement to provide additional gas reserves for a higher gas price to take effect before January 1, 1975, the first date for a new redetermined price. On May 9, 1974, Armour of Amoco wrote KP&L suggesting such a contract and invited KP&L to draft an appropriate amendment to the 1960 contract. Mr. Williamson of KP&L responded to both the redetermination notice and Amoco's May 9, 1974, letter by correspondence dated June 13, 1974. In this letter KP&L suggested the new redetermined price agreement beginning January 1, 1975, include price upgrading for additional gas. However, on June 24, 1974, Gene Benignus of KP&L telephoned Mr. Meadows of Amoco to inform Amoco that KP&L no longer de-

sired an agreement providing for price upgrading for increased reserves before the January 1, 1975, price redetermination date. Thereafter Meadows ordered the appropriate Amoco engineers to cease plans to rework or redrill gas wells for KP&L.

From this point onward the parties concentrated solely on a price redetermination amendment to the 1960 contract. On July 25, 1974, representatives of KP&L and Amoco met in Wichita to negotiate this amendment. Amoco's providing additional supplies to KP&L was a factor discussed at this meeting. This is reflected in a letter dated July 31, 1974, by KP&L's Williamson to Amoco, summarizing the concepts discussed at the meeting:

> We are proposing that the price for all gas will be forty-four cents per MCF during the entire year of 1975, forty-five cents during 1976, and forty-six cents during 1977. We would further suggest that the price to be effective in 1978 would be negotiated.
>
> .    .    .    .    .
>
> All of this is based on the understanding that Amoco plans to work over certain wells in the Lemon and Victory areas, all of which should result in KPL receiving additional daily quantities of gas and the results of your work-overs should also make available to us additional reserves.

After this meeting, and at KP&L's request, Amoco submitted on September 23, 1974, the initial draft of the 1960 contract amendment providing for the new price redetermination. From this point onward the evidence is void of any insistence, nor even a mention, by KP&L on including an obligation by Amoco to rework any wells for KP&L. The only evidence of such a factor turns up in some rough notes prepared by Meadows of Amoco used in a negotiation session with KP&L officials on October 25, 1974. He had written: "Threaten not to perform workover." This was probably meant to be a bargaining chip. However, this was not brought up at the meeting. More importantly, there is absolutely no semblance of a requirement in the end product of these negotiations, Letter Agreement No. 22, that Amoco was to rework any gas wells. The glaring absence of such a requirement compels this Court to find a final meeting of the minds on this point was never achieved between KP&L and Amoco. Consequently, regardless of the factors discussed in the parties' preliminary discussions, we can only look to the written agreement, Letter Agreement No. 22 to determine the parties' rights and obligations:

> The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights. (*Arensman v. Kitch*, 160 Kan. 783, 789, 165 P.2d 441; *Hudson v. Riley*, 104 Kan. 534, 539, 180 P. 198; *Hudson State Bank v. Haile*, 130 Kan. 322, 286 P. 228; *Grantham v. Hanenkratt Lead & Zinc Co.*, 131 Kan. 535, 542, 292 P. 757; *Continental Supply Co. v. Morgan*, 133 Kan. 121, 123, 298 P. 790; and *McKay v. Clark*, 162 Kan. 653, 659, 178 P.2d 679.

*Custom Built Homes Co. v. State Comm. of Rev. and Taxation*, 184 Kan. 31, 34, 334 P.2d 808, 814 (1959); *see also, Gardner v. Spurlock*, 184 Kan. 765, 339 P.2d 65 (1959); *McKay v. Clark*, 162 Kan. 653, 178 P.2d 679 (1947).

Lastly, support for our conclusion that there was no agreement reached to rework any gas wells is found in a letter to Amoco from KP&L dated January 5, 1976. In this letter KP&L made the following inquiry:

> At about this time last year when we were discussing a new pricing schedule for gas which we are purchasing under the terms of our contract dated April 18, 1960, you indicated that Amoco was considering reworking, or possibly drilling, some new or replacement wells in the Kinsler, Nicholas, and Lemon areas in western Kansas.
>
> We are wondering if Amoco still plans any development in those areas and

would appreciate it if you could bring us up to date on any possible plans you may have to increase the available gas supply from these areas.

This inquiry was made long after Letter Agreement No. 22 was executed on March 24, 1975. This letter makes no sense unless it is concluded that Amoco was under no legal obligation to rework or drill any additional wells.

The Court recognizes that in Letter Agreement No. 22 Amoco received greatly increased prices, a clause allowing price redeterminations annually instead of once every five years, a new deregulation clause, and a favored nations clause. It could very well be that in hindsight KP&L struck a very bad "bargain" for itself. Nevertheless, this Court regretfully cannot reform KP&L's contract to correct a bad deal.

In conclusion, the plaintiff's motion for summary judgment is granted and the defendant's summary judgment motion is denied. At this juncture the Court notes the thrust of Amoco's case has been that the favored nations clause in Letter Agreement No. 22 was first triggered by F.P.C. Opinion 770. However, the plaintiff's complaint reflects that it originally contended this escalator clause was triggered by F.P.C. Opinions 669 and 742. The Court is disregarding this original contention because they were both in effect before Letter Agreement No. 22 was signed and would result in a triggering of the escalator clause on the first effective date of Letter Agreement No. 22. Since this result would be nonsensical, the Court finds the favored nations clause was activated on July 27, 1976, the first effective day of F.P.C. Opinion 770. Since this finding may cause a reduction in the amount prayed for by Amoco, $2,884,003.00, counsel for Amoco Production Co. is directed to forthwith calculate the proper damage figure for July 27, 1976, onward plus statutory interest, and to prepare an entry of judgment to be filed with the Clerk after approval by counsel for Kansas Power and Light. Costs are to be taxed against the defendant.

IT IS SO ORDERED.